**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| PETROLEUM MARKETING GROUP, INC. ) <br> 2900 Telestar Court ) <br> Falls Church, Virginia 22042 ) <br> ) <br>        Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BP PRODUCTS NORTH AMERICA, INC. ) <br>    Serve Resident Agent: ) <br>    The Corporation Trust, Incorporated ) <br>    2405 York Road, Suite 201 ) <br>    Lutherville Timonium, Maryland 21093 ) <br> ) <br> and ) <br> ) <br> TA OPERATING, LLC. ) <br>    Serve Resident Agent: ) <br>    The Corporation Trust, Incorporated ) <br>    2405 York Road, Suite 201 ) <br>    Lutherville Timonium, Maryland 21093 ) <br> ) <br>        Defendants. ) | Civil No. _____ <br><br> **<u>DEMAND FOR JURY TRIAL</u>** |

## <u>COMPLAINT</u>

1. This is an action for preliminary and permanent injunctive relief and damages under the Petroleum Marketing Practices Act, 15 U.S.C §2801, *et seq*. ("PMPA" or the "Act"). It seeks to enjoin the unlawful nonrenewal of a franchise relationship between Plaintiff Petroleum Marketing Group, Inc. (hereinafter "Plaintiff" or "PMG") and Defendant BP Products North America. Inc. ("BP"). The franchise relationship arose out of a franchise consisting of two contracts—a Branded Jobber Contract ("BJC") between Plaintiff Petroleum Marketing Group, Inc. ("PMG") and BP and a Master Equipment Sublease and Services Agreement (the "Sublease") between Plaintiff and BP's wholly-owned subsidiary, TA Operating, LLC ("TA").

2.      The BJC authorizes Plaintiff to sell motor fuels purchased from BP under BP's trademarks at various locations (the "Approved Sites"), including certain premises covered by the Sublease between TA and PMG.  TA did not offer PMG a renewal of the Sublease upon its stated expiration on August 31, 2026, thereby failing to extend or continue certain essential elements of the franchise relationship between the parties in violation of 15 U.S.C. §2802(a)(2).  By this action, Plaintiff seeks to enjoin the unlawful nonrenewal of its franchise relationship on a preliminary and permanent basis.

## JURISDICTION AND VENUE

3.      This Court possesses jurisdiction over this action pursuant to 28 U.S.C. §1331 because this Court has original jurisdiction of all civil actions arising under the laws of the United States, specifically section 2805(a) of the PMPA, 15 U.S.C. §2805(a).

4.      Venue lies in this district pursuant to 15 U.S.C. §2805(a) because the Plaintiff-franchisee was at all times relevant hereto doing business in this district.

## THE PARTIES

5.      Plaintiff is a corporation organized and existing under the laws of the State of Maryland.  It conducts business as a wholesale distributor and retailer of motor fuels (gasoline and diesel fuel) sold under various trademarks and other brand identifications, including the "BP" and "Amoco" brands.  As is pertinent here, Plaintiff sells BP branded fuels to motorists at certain travel centers in the States of Maryland and Connecticut.  Defendant TA Operating, LLC ("TA") leases the premises on which the travel centers are located from a third-party owner and subleases them to Plaintiff under the Sublease.

6.      Defendant BP Products North America, Inc. ("BP") is a major integrated refiner and marketer of motor fuels sold under the "BP," "Amoco" and other brands at motor fuel outlets

nationwide. BP sells motor fuels to Plaintiff under a Branded Jobber Contract ("BJC") for resale at various BP branded locations such as gas stations, convenience stores, travel centers and other retail outlets.

7.      Defendant TA is a limited liability company engaged in the operation of truck stops and travel centers in various states throughout the Nation.  A small portion of five of the travel centers (consisting of fueling islands) is subleased to Plaintiff to accommodate Plaintiff's sales of BP branded motor fuels (as well as certain unbranded fuels) to consumers at each site.  Plaintiff sells BP branded motor fuels to the motoring public at fueling islands in the "forecourt" (at the front of) each travel center, and its sells unbranded diesel fuel to truckers at a fueling island in the rear of the travel center or at another location away from the forecourt.  The two small portions subleased to Plaintiff are situated in and around the fueling islands, and each of them is sufficient in size only to permit ingress and egress to the gas pumps at which motor fuels are sold.  TA's former parent company, Travel Centers of America, Inc., was acquired by BP in 2023, making TA an indirect wholly-owned subsidiary of BP.

## FACTUAL BACKGROUND

8.      On February 4, 2022, Plaintiff entered into the BJC with Defendant BP.  The BJC required, among other things, the sale of certain minimum quantities of gasoline by BP to Plaintiff, and it authorized Plaintiff to sell the product under BP's trademarks at certain specified retail outlets which are referred to in the BJC as the "Approved Retail Sites."  The Approved Retail Sites (which are listed on Attachment "A" to the BJC) represent the sites at which Plaintiff is authorized to sell the gasoline it purchases under BP's trademarks.  It provides, therefore, for a series of individual trademark licenses for each of the sites listed on Attachment A. Following BP's acquisition of Travel Centers of America, Inc. in 2023, the parties to the BJC amended Attachment

A to include the five TA Travel Centers referred to above at which Plaintiff sells BP branded motor fuels to consumers.

9.      Plaintiff entered the aforementioned Sublease with TA on June 15, 2023 in the immediate aftermath of TA's acquisition by BP.  By its very nature, the Sublease could just as easily be characterized as an access agreement. Section 2.1(b) of the Sublease grants Plaintiff "a license to access the Premises (and any ancillary areas of the Premises that are reasonably necessary to provide ingress and egress to and from the Fuel Facilities)."  The Sublease provides a list of the items of equipment it leases to Plaintiff, but as to real property, it includes only the "land and pavement in, around, and ingress egress to, the fuel station canopies," meaning the area immediately adjacent to the fueling islands.  The "Term" of the Sublease commenced in or about August of 2023 and it expires on August 31, 2026.

10.      The fee interest in the land at which each of the Travel Centers is located is owned by a real estate investment trust which, on information and belief, does business as Service Properties Trust.  Service Properties Trust subleases the premises to TA, which prior to the BP acquisition, operated the travel centers and made all motor fuel sales.  After BP's acquisition of TA, however, TA became a subsidiary of BP, thus making it subject to Maryland's and Connecticut's retail divorcement laws which prohibit refiners, like BP, and their subsidiaries, from engaging in retail sales of motor fuels.  At that point, BP arranged for a major operational change at the TA travel centers in Maryland and Connecticut with respect to motor fuel sales.  BP decided that motor fuel sales at the applicable travel centers would no longer be made by TA.  The sales would be undertaken by an independent third-party chosen from among BP's branded retailers.

11.      Plaintiff PMG was then recruited by BP to make all retail sales of motor fuels at the travel centers and to occupy the above-referenced small areas at each travel center under a unitary

Sublease with PMG.  All of the discussions, negotiations, and arrangements PMG had or made prior to entering the Sublease were with representatives of BP.  PMG had no discussions with TA representatives until the decision was made by BP to permit PMG to enter a Sublease for the for a small portion of the travel centers, and it was not until that point that PMG met with TA representatives to discuss the specifics of what ultimately became the Sublease executed by the parties.  During the Term of the Sublease, PMG communicated principally with BP representatives with respect to matters concerning the Sublease and its operational responsibilities.

12.    BP had sufficient practical control of its wholly-owned subsidiary to change the operational model at the travel centers to one utilizing BP branded retailers to sell fuels, to appoint PMG as the entity that sells motor fuels at the travel centers, and to secure for PMG a Sublease authorizing it to occupy the fueling islands at the travel centers to fulfill these obligations.  It also had sufficient power through its control of TA, and under the BJC, to replace PMG with a new BP branded operator as it did in or about July of 2026.  This decision by BP foreclosed the possibility of TA offering PMG a renewal or extension of its existing Sublease, or possibly a new one.  PMG had to vacate the travel centers to make room for the new operator chosen by BP.

13.    Thus, TA sent a letter to PMG, dated July 15, 2926, reminding it that the Sublease would expire on August 31, 2026, with no mention of a renewal or other extension of the Sublease, much less the offer of a new sublease.  PMG then reached out to BP to seek clarification of BP's intentions with respect to renewal, and to protest what appeared to be a decision by BP to replace PMG with another operator.  Thereafter, BP confirmed its intention to replace PMG in conversations between the parties that occurred after PMG's receipt of the July 15, 2026 letter.

14.    BP's decision to replace PMG as the operator of the BP branded sales businesses at the five travel centers led to: (i) a termination (effective August 31, 2026) of the five trademark

licenses for the travel centers that are contained in Attachment A of the BJC: (ii) a decision to allow the Sublease to expire with no offer of renewal; and (iii) a decision to offer a new sublease to the new replacement operator. Accordingly, the decision not to continue, extend, or renew the Sublease beyond its expiration date was the direct and inevitable consequence of a decision made by BP to reserve the areas formerly occupied by PMG for a new operator.

**COUNT I**
**(Unlawful Nonrenewal Under The PMPA)**

15. The PMPA, 15 U.S.C. §2801, *et seq.* is the exclusive rule of law to be consulted in determining the validity of the termination of a franchise or the nonrenewal of a franchise relationship. The congressional objective underlying the PMPA was the creation of a uniform set of rules governing the grounds for termination of a franchise or the nonrenewal of a franchise relationship and the notice which franchisors must provide franchisees prior to termination or nonrenewal.

16. Section 2806 of the Act, 15 U.S.C. §2806, contains an express preemption clause that preempts all state law in the area. The preemptive scope of the PMPA is a broad one. Its breadth evinces an intent by Congress to occupy the field relating to termination and nonrenewal of petroleum franchises. Thus, the Act preempts any state law with respect to termination and nonrenewal that differs from the PMPA.

17. The term "franchise" means, among other things, any contract between a refiner, like BP, and a distributor or retailer, like PMG, under which the distributor or retailer, as the case may be, is authorized to use a trademark which is owned or controlled by a refiner which supplies motor fuel to a distributor or retailer in connection with the sale of motor fuels. 15 U.S.C. §2801(1)(A).

6

18.     The term "franchise" also "*includes any contract* under which a retailer or distributor (as the case may be) is authorized or permitted to occupy *leased marketing premises*" to be employed in connection with the sale of motor fuel under the trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. 15 U.S.C. §2801(1)(B).  (emphasis added).

19.     The term "leased marketing premises" means "marketing premises owned, leased, or *in any way controlled* by a franchisor and which the franchisee is authorized or permitted under the franchise to employ in connection with the sale . . . of motor fuel.  15 U.S.C. §2801(9). (emphasis added). The "in any way controlled" language is broadly-stated, and it includes direct, indirect, and constructive control.

20.     The "franchise" at issue in this case consists of the BJC and the Sublease.  BP is the "franchisor" under the PMPA and Plaintiff is the "franchisee." See, 15 U.S.C. §§2801(3) and (4).  The BJC is a contract between a refiner and a retailer.  BP is an integrated refiner and marketer of motor fuels, and Plaintiff is a retailer that sells motor fuels directly to consumers under BP's brand identifications at five of the six travel centers. The BJC authorizes Plaintiff to sell motor fuels purchased from BP under BP's trademarks, and it explicitly and specifically authorizes such sales of BP branded motor fuels at the aforesaid travel centers.

21.     The Sublease is included in the franchise because it is a "contract" which authorizes the franchisee to occupy "leased marketing premises" as defined in 15 U.S.C. §2801(9).  The leased marketing premises are employed in connection with the sale of motor fuel under BP's trademarks as required by 15 U.S.C. §2801(1)(B), and the BJC explicitly authorizes the sale of BP's branded fuels at the leased marketing premises at the travel centers. The "leased marketing premises" consist of a small area in the forecourt of each of the TA travel centers at which BP

7

branded motor fuels are sold to the public.  It is the *only* area leased to Plaintiff for the sale of motor fuels *under the franchise,* meaning for the sale of the branded fuels subject to a trademark license for each specific travel center.   This area of the forecourt is also a leased marketing premises because it is controlled by BP, the franchisor, within the meaning of Section 2801(9).

22.   These above-described area which comprises the "leased marketing premises" meets the requirement of being "*in any way controlled by the franchisor,*" for three reasons.  First, BP controls this area through its control of its subsidiary, TA. Second, it controls the area through the application of its brand standards, which are binding on the operator by the BJC.  Third, BP's brand standards are incorporated by reference in, and made a part of, the Sublease.

23.   The brand standards govern the appearance, image, trademarks, trade dress, lighting, advertising and color schemes displayed in and around the BP branded fueling islands. BP also controls the sales and other promotions undertaken at the marketing premises, the content and amount of advertising allowed to exist there, and the operations of PMG within the area.  BP's brand standards control the canopy configuration, its height, color, trademark design, location, lighting, and all of its other features.  BP controls the design and features of the gasoline dispensers (the "pumps") and the products they dispense, as well as the placement and design of signage, such as LED price signs, and the advertising displayed on video screens at the dispensers.  These image, appearance, operational standards are designed to ensure a consistency of appearance of BP stations throughout the United States and abroad, and to create an easily-recognizable image to the consuming public. In order to achieve this consistency, BP must control the forecourt everywhere its trademarks appear. Adherence to the brand standards is demanded explicitly by the Sublease, which states that "Lessee shall comply with all brand standards required by Lessee's supplier of Fuel Products [*i.e.*, BP], and any such failure to comply shall be a breach of this Agreement."  In

8

this small area of the forecourt which constitutes the "leased marketing premises," BP controls every aspect of its design, its image, and the operational standards which must be adhered to. Indeed, the BJC devotes significant space and attention to these appearance, image, and operational standards which must be implemented in the portion of the forecourt that comprises the "leased marketing premises."

24.    The extent of BP's control of the marketing premises through its control of TA is evident from the explicit requirement of the Sublease that "[a]s a condition of this Agreement, Lessee shall cause [Plaintiffs'] thirty-two (32) existing fuel station locations in the Baltimore market to become branded "BP" or "Amoco." The Sublease also conditions TA's discretion to extend the Term of the Sublease on the "Lessee's elect[ion] to enter into an agreement (a 'Fuel Supply Agreement') with Lessor or an Affiliate of Lessor, in respect of the supply of Fuel Products branded "BP," "AMOCO" or any other brand of Lessor or its Affiliates."  TA included these requirements at the behest of its parent company, BP.

25.    Moreover, for purposes of the PMPA, TA is considered a part of BP.  BP's status a "franchisor" is dependent on its status as a "refiner," which is defined as "any person engaged in the refining of crude oil to produce motor fuel *and includes any affiliate of such person*." 15 U.S.C. §2801(5). (emphasis added). The term "affiliate" is defined as any person who (other than by means of a franchise) controls, is controlled by, or is under common control with, any other person. TA is a wholly-owned subsidiary of BP, making it an affiliate for purposes of the PMPA.

26.    The "franchise relationship" between BP and Plaintiff consists of the respective responsibilities and obligations of the parties which result from the marketing of motor fuel under a franchise. 15 U.S.C. §2801(2).  A franchise relationship is nonrenewed under the PMPA when the franchisor does not "reinstate, continue or extend the franchise relationship."  15 U.S.C.

9

§2801(14).  A nonrenewal of the franchise relationship occurs whenever the franchisor's actions deprive the franchisee of any one or more of *the three statutory elements of the franchise*, which are the trademark license, the supply of motor fuels, and the lease for the marketing premises. The nonrenewal deprived Plaintiff of all three of the essential elements of the franchise -- the trademark licenses for the five travel centers, the gasoline earmarked for the five travel centers, and the contract for the leased marketing premises.  BP's failure to reinstate, continue or extend the franchise relationship in the absence of any ground for nonrenewal under the PMPA is a violation of the Act which is actionable under 15 U.S.C. §2805(a).

### COUNT II
### (Failure to Provide a Notice of Nonrenewal in Accordance with the PMPA)

27.    The nonrenewal is also unlawful and actionable because of BP's failure to provide Plaintiff with requisite notice of nonrenewal in accordance with 15 U.S.C. §2804, which requires, among other things, a statement of one or more of the grounds set forth in the PMPA under which a nonrenewal is permissible. The above-referenced TA letter sent to PMG reminding it of the expiration date of the Sublease does not refer to any nonrenewal; it does not set forth any of the grounds for nonrenewal; it did not contain the summary statement of PMPA rights required by 15 U.S.C. §2804(d), and it made no mention of the PMPA or Plaintiff's right to challenge the nonrenewal in accordance with 15 U.S.C. §2805.

28.    In fact, the notice was not sent by the franchisor, BP, who made no mention of the nonrenewal or the above-referenced letter sent to PMG by its wholly-owned subsidiary, TA. In fact, BP denied the existence of any franchise or franchise relationship created by the BJC and the Sublease, or any nonrenewal of a franchise relationship with PMG.  The failure to provide adequate notice in strict compliance with the PMPA is a basis, in and of itself, for the illegality of the nonrenewal and for the relief requested herein.

## COUNT III
### (Joinder of TA Under F.R.C.P. 19(a)(1)(A)

29.      Federal Rule of Civil Procedure 19(a)(1)(A) requires the joinder of TA as a party to this action where, as here, in TA's absence, "the court cannot accord complete relief among the existing parties." *Id.*  To enjoin the unlawful nonrenewal in this case, the Court would have to order TA to extend and continue the term of the Sublease, preliminarily, until a decision on the merits is rendered by the Court and, thereafter, until BP asserts a ground for nonrenewal that is authorized by the PMPA. A nonrenewal is means "a failure to reinstate, continue, or extend the franchise relationship at the conclusion of the term or on the expiration date." 15 U.S.C. §2801(14)(A).  To remedy an unlawful nonrenewal, as part of either preliminary or permanent injunctive relief, the Court's order would have to require that the Sublease between TA and PMG be extended by TA. And to ensure that TA is able to extend the franchise, as a practical matter, TA should be enjoined from providing a leasehold or other occupancy right to any other person, including any new operator chosen by BP.

30.      TA's joinder as a party-Defendant will not deprive the Court of either subject matter or personal jurisdiction. The Court's jurisdiction over the subject matter of this action rests on federal question jurisdiction under 28 U.S.C. §1331, as well as ancillary jurisdiction, neither of which will not be disturbed by TA's presence.  TA is also subject to service of process in the State of Maryland by virtue of its conduct of business in the State, its use of property in the State, and its supply of goods, food, services, or manufactured products in Maryland. See, MD. CODE CTS & JUD. PRO. §6-103.

31.      In such circumstances, the joinder of TA as a party to this action is a requirement of law and it provides a basis for the issuance of any injunctive relief against TA that the Court determines is necessary to provide complete relief to Plaintiff.

**WHEREFORE**, plaintiff demands full and final judgment in its favor and against Defendants and:

(a)    A preliminary injunction (A) enjoining Defendants from: (i) taking any action to remove Plaintiff from the premises covered by the Sublease or limiting the scope or duration of the Sublease or Plaintiff's tenancy thereunder; (ii) disturbing Plaintiff's conduct of business at said premises as it has heretofore been conducted since the inception of the Sublease; and (iii) authorizing any third-party to occupy any portion of the travel center covered by the Sublease; and (B) ordering Defendant BP to: (i) reinstate and/or refrain from cancelling or ending, the trademark licenses contained in the BJC that authorize Plaintiff to make motor fuel sales under BP's trademarks at the premises covered by the Sublease; and (ii) continue selling Plaintiff sufficient quantities of branded motor fuels with which to make such sales; and (C) ordering Defendant TA to: (i) extend the duration of the Sublease until such time as a decision has been rendered by the Court; and (ii) take no action to terminate or cancel the Sublease without the advance written approval of the Court.

(b)    A permanent injunction: (i) enjoining Defendants from nonrenewing or otherwise allowing  the Sublease to expire or, in the alternative, ordering Defendants to extend the Term of the Sublease until such time as Defendants offer Plaintiff a new renewal Sublease in accordance with the procedural and substantive requirements of the PMPA; and (ii) enjoining Defendant BP from terminating, nonrenewing or otherwise limiting the scope of the BJC so as to eliminate or restrict Plaintiffs operation of the BP branded motor fuel businesses at the TA travel centers.

(c)    An award of compensatory damages to compensate Plaintiff for any lost profits or other business injury incurred in connection with the nonrenewal of the franchise relationship between BP and Plaintiff;

(d)    An award of Plaintiff's cost of this action, including without limitation, reasonable attorneys' and expert witness fees pursuant to 15 U.S.C. §2805(d)(1)(C); and

(e)    Such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

_____*/s/  Alphonse M. Alfano*_____
Alphonse M. Alfano, D.Md. Bar No. 13862
BASSMAN, MITCHELL, ALFANO & LEITER, CHTD.
1707 L Street, N.W., Suite 560
Washington, D.C.  20036
Tel:  (202) 466-6502; Fax:  (202) 331-7510
Email: bma@bmalaw.net

Attorneys for the Plaintiff

13