**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| **PETROLEUM MARKETING GROUP, INC.,**<br>Plaintiff,<br>v.<br>**BP PRODUCTS NORTH AMERICA, INC.**<br>and<br>**TA OPERATING LLC,**<br>Defendants. | | Civil No. 1:26-cv-03084-RDB |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 1

FACTUAL BACKGROUND ..... 4

I. The Parties ..... 4
II. The Typical Structure in the Motor Fuel Industry ..... 5
III. The PMPA Franchise: The BPPMA-PMG Branded Jobber Contract ..... 5
IV. PMG Subleases Certain Equipment from TA ..... 6
V. PMG and BPPNA Add Five (5) of the Sublease Sites to Attachment A to the BJC ..... 10
VI. Expiration of the Sublease's Fixed Three-Year Term ..... 11
VII. PMG's Continuing PMPA Franchise and Franchise Relationship with BPPNA ..... 11

ARGUMENT ..... 11

I. PMG Cannot Satisfy the Threshold Requirements for a Preliminary Injunction Under the PMPA. ..... 12
II. PMG Fails to Meet the Standard for Injunctive Relief under the PMPA ..... 25
III. The PMPA Does Not Permit Any Injunction Related to Unbranded Fuel ..... 27
IV. If the Court Grants Any Injunctive Relief, It Should Require a Substantial Bond ..... 29

CONCLUSION ..... 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barnes v. Gulf Oil Corp.*,
824 F.2d 300 (4th Cir. 1987) ....................12

*Beachler v. Amoco Oil Co.*,
112 F.3d 902 (7th Cir. 1997) ....................12, 21

*BP W. Coast Prods. LLC v. Crossroad Petroleum, Inc.*,
No. 12CV665 JLS (KSC), 2012 WL 13124729 (S.D. Cal. Apr. 19, 2012)....................5

*Catch 26, LLC v. LGP Realty Holdings, LP*,
No. 17-CV-6135, 2017 WL 4864856 (N.D. Ill. Oct. 27, 2017) ....................28

*Checkrite Petroleum, Inc. v. Amoco Oil Co.*,
678 F.2d 5 (2d Cir. 1982)....................13

*Clark v. BP Oil Co.*,
137 F.3d 386 (6th Cir. 1998) ....................18

*Dersch Energies, Inc. v. Shell Oil Co.*,
314 F.3d 846 (7th Cir. 2002) ....................13, 18

*DG Gas, LLC v. TA Franchise Sys. LLC*,
No. 1:24-CV-01002-PAB, 2025 WL 814928 (N.D. Ohio Mar. 14, 2025)....................28

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003), *superseded in part by statute on other grounds* ....................16

*Ellis v. Mobil Oil Corp.*,
969 F.2d 784 (9th Cir. 1992) ....................18

*Four S Shell Ltd. Liab. Co. v. PMG Ltd. Liab. Co.*,
No. 16CV5701PGSTJB, 2020 WL 5642190 (D.N.J. Sept. 22, 2020)....................4

*Fursyth Petroleum Found. Inc. v. PMIG 1025, LLC*,
2022 WL 1663564 (D. Md. May 25, 2022)....................4

*Han v. Mobil Oil Corp.*,
73 F.3d 872 (9th Cir. 1995) ....................8, 15, 22, 24

*Hoechst Diafoil Co. v. Nan Ya Plastics, Inc.*,
174 F.3d 411 (4th Cir. 1999) ....................29

*Hutchens*, 838 F.2d at 1144 ....................19

*In re Ramreddy, Inc.*,
440 B.R. 103 (2009)....................15

*Interstate Petroleum Corp. v. Morgan*,
249 F.3d 215 (4th Cir. 2001)....................21

*Jet, Inc. v. Shell Oil Co.*,
No. 02 C 2289, 2002 WL 31641627 (N.D. Ill. Nov. 22, 2002).................... *passim*

*Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. LLC*,
559 U.S. 175, 130 S. Ct. 1251, 176 L. Ed. 2d 36 (2010)....................5, 18, 25

*May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*,
869 F.2d 917 (6th Cir. 1989)....................5, 14, 18, 26

*Patel v. Sun Co. Inc.*,
63 F.3d 248 (3d Cir. 1995)....................12, 20, 21

*Sammy's Mem'l Texaco, Inc. v. Chevron U.S.A., Inc.*,
No. CIV.A. H-06-1543, 2006 WL 2559649 (S.D. Tex. Sept. 5, 2006)....................20, 21

*Service Road Gulf, Inc. v. Gulf Oil Corp.*,
624 F. Supp. 496 (D. Conn. 1986)....................21

*Shell Oil Co. v. Hillary Farmer Serv. Station, Inc.*,
739 F. Supp. 749 (E.D.N.Y. 1990)....................18

*Smith v. Atlantic Richfield Co.*,
533 F. Supp. 264 (E.D. Pa. 1982)....................14

*Svela v. Union Oil Co. of Cal.*,
807 F.2d 1494 (9th Cir. 1987)....................18

*Valentine v. Mobil Oil Corp.*,
789 F.2d 1388 (9th Cir. 1986)....................12

*Yogi Krupa, Inc. v. GLeS, Inc.*,
No. 22-226-CFC, 2022 WL 16834164 (D. Del. Nov. 9, 2022)....................20

**Statutes**

15 U.S.C. § 2801(1)(A)....................12, 18

15 U.S.C. § 2801(1)(A), (1)(B)....................28

15 U.S.C. § 2801(1)(B)....................15

15 U.S.C. § 2801(1)(B)(i)....................17

15 U.S.C. § 2801(2) ....................22

15 U.S.C. § 2801(3) ....................16, 17, 20

15 U.S.C. § 2801(5) ....................16, 19

15 U.S.C. § 2801(9) ....................15, 17

15 U.S.C. § 2801(14)(A)....................22, 25

15 U.S.C. § 2801(15) ....................21

15 U.S.C. § 2805....................15

15 U.S.C. § 2805(a) ....................18, 21

15 U.S.C. § 2805(b)(2) ....................11

15 U.S.C. § 2805(b)(2)(A)....................25

15 U.S.C. § 2805(b)(2)(B) ....................26

15 U.S.C. § 2805(b)(3) ....................29

Conn. Gen. Stat. § 14-344c....................6

Md. Code Ann., Bus. Reg. § 10-311....................6

Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801 *et seq.* .................... *passim*

**Other Authorities**

Rule 19....................21, 22

Rule 19(a)(1)(A) ....................21

Rule 65(c)....................29

S. Rep. No. 95-731, 95th Cong., 2d Sess. 15 (1978) ....................26

## PRELIMINARY STATEMENT

Defendants BP Products North America Inc. ("BPPNA" or "BP") and TA Operating LLC ("TA") (collectively, "Defendants"), by and through their undersigned counsel, respectfully submit this Memorandum in Opposition to Plaintiff Petroleum Marketing Group, Inc.'s ("PMG") Motion for a Preliminary Injunction.

PMG asks this Court to issue the extraordinary remedy of a preliminary injunction[1] to prevent the expiration of a standalone equipment lease—one that PMG knowingly entered for a fixed three-year term and that, by its express provisions, expires on August 31, 2026.

PMG's request, while creative, is legally flawed. It attempts to convert an expiring Master Equipment Lease and Services Agreement (the "Sublease") with TA into a franchise relationship with BPPNA to argue violation of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801 *et seq.*

But the critical fact that PMG obscures is that its actual PMPA franchise—a Branded Jobber Contract ("BJC") with BPPNA—and franchise relationship with BPPNA existed years before the Sublease and will continue in full force and effect after August 31, 2026. PMG will continue to have the statutory elements at the heart of its franchise relationship with BPPNA: use of BPPNA's trademarks and supply of motor fuel from BPPNA. Indeed, PMG will continue to operate bp-branded locations (or sublicense others to do so) at more than 100 sites. Nothing about PMG's PMPA franchise relationship is ending.

---

[1] PMG seeks a mandatory injunction, not merely a prohibitory injunction. PMG seeks an order compelling continuation of a lease beyond its negotiated expiration date and compelling continuation of site-specific rights after those rights have expired by contract. Such relief alters, rather than preserves, the parties' existing legal relationships.

PMG's request is fundamentally inconsistent with its own allegations. On one hand, PMG correctly identifies the BJC as the PMPA franchise, and admits that the BJC will remain in effect after August 31, 2026. On the other hand, PMG asks the Court to treat expiration of a separate equipment lease as the nonrenewal of the PMPA franchise relationship.

The PMPA protects against termination of a franchise or nonrenewal of the franchise relationship related to the licensing and supply of branded motor fuel. Because the PMG-BPPNA franchise relationship continues after expiration of the Sublease, PMG cannot satisfy this threshold requirement for PMPA relief. What PMG characterizes as an unlawful "nonrenewal" is nothing more than the scheduled expiration of a separate, independent lease between PMG and TA—a different legal entity—that by its terms grants no trademark rights and does not govern BPPNA's supply of motor fuel. Despite its manufactured surprise at the lease ending, PMG acknowledged when it negotiated the Sublease that it had a fixed three-year term and that renewal was entirely within TA's "sole discretion." PMG cannot now invoke the PMPA to rewrite that bargain and compel continuation of an equipment lease that expires by its own agreed-upon terms.

Consequently, PMG's motion fails at every level of analysis. First, the Sublease is not the PMPA franchise between BPPNA and PMG. It grants no trademark rights, imposes no fuel-supply obligations, and was executed by TA rather than BPPNA. Instead, the franchise PMG identifies in its own Complaint arises from the BJC, which separately governs PMG's rights to use BPPNA trademarks and purchase bp-branded fuel.

Second, TA is not a franchisor as defined in the PMPA. PMG's own allegations identify BPPNA as the entity that grants trademark rights and supplies branded fuel. By contrast, TA is merely the lessor under a separate equipment lease, and the Sublease expressly disclaims any

authorization to use BPPNA trademarks, a fundamental requirement in the definition of "franchisor."

Third, PMG improperly seeks to equate expiration of the Sublease with nonrenewal of the franchise relationship. But the parties' trademark and fuel-supply franchise relationship—as it has existed for decades—continues after August 31, 2026, and PMG already operated under that franchise long before the Sublease existed. PMG already had a PMPA franchise relationship before entering the TA Sublease; PMG will still have that same PMPA franchise relationship after the TA Sublease expires.

Fourth, PMG seeks relief that extends beyond the franchise rights protected by the PMPA. The Sublease covers branded and unbranded fuel operations alike, yet the PMPA protects only nonrenewal of a franchise relationship for the marketing of branded motor fuel. PMG, therefore, cannot simply treat all aspects of the Sublease, both unbranded and branded fuel, as protected by the statute.

Fifth, the balance of hardships favors Defendants. PMG—a 1,200-location fuel wholesaler operating in 19 states—seeks to override the express terms of a negotiated agreement that provides for expiration of the Sublease on August 31, 2026. By contrast, the requested injunction would compel TA to extend a commercial lease beyond its fixed term and interfere with TA's contractual and property rights to which PMG expressly agreed.

Even if the Court determines that some preliminary injunctive relief is warranted, the scope of any such relief must be tailored to the franchise rights actually protected by the PMPA. PMG seeks relief that extends beyond those rights. Accordingly, any injunctive relief cannot extend to (1) unbranded fuel operations at the TA locations because the PMPA does not apply to unbranded

fuel sales; or (2) TA, which is not PMG's "franchisor" and therefore is not subject to PMPA liability.

For these reasons, and those set forth more fully below, the Court should deny PMG's Motion for a Preliminary Injunction.

## FACTUAL BACKGROUND

### I. The Parties

PMG is a wholesale distributor and retailer of motor fuels. PMG publicly describes itself as "one of the largest wholesalers and distributors of petroleum products on the East Coast," employing more than 600 people and supporting a network of over 1,200 gas stations across 19 states.[2] *See* https://petromg.com/about/history/. PMG distributes and sells motor fuel under many brands, including bp, Shell, Exxon, Mobil, and Marathon. *See* https://petromg.com.

BPPNA is a refiner of motor fuels sold under the "bp" and "Amoco" trademarks, among others, throughout the United States. (ECF #2-2 at 10.) TA operates and franchises travel centers in many states under the "TA" (TravelCenters of America) and "Petro" brands. (Clancy Decl. ¶ 3.) The sole member of TA Operating LLC is TravelCenters of America Inc., which is an indirect wholly-owned subsidiary of BPPNA. (Clancy Decl. ¶ 2.) TA is a separate legal entity from BPPNA with its own management, operations, and business functions. (Clancy Decl. ¶ 3.)

---

[2] PMG has extensive experience with the PMPA, previously litigating PMPA issues including in this District. *See e.g., Fursyth Petroleum Found. Inc. v. PMIG 1025, LLC*, 2022 WL 1663564 (D. Md. May 25, 2022) (granting preliminary injunction against PMG affiliate as a franchisor under the PMPA where indication that it acted in bad faith); *Four S Shell Ltd. Liab. Co. v. PMG Ltd. Liab. Co.*, No. 16CV5701PGSTJB, 2020 WL 5642190 (D.N.J. Sept. 22, 2020) (determining, following a trial, that PMG acted in bad faith with PMPA nonrenewal of its retailer).

## II. The Typical Structure in the Motor Fuel Industry

At the time the PMPA was enacted in 1978, most motor fuel relationships were between a refiner and retailer, or a distributor and retailer, involving a relationship in which "the franchisor leases the service-station premises to the franchisee, grants the franchisee the right to use the franchisor's trademark, and agrees to sell motor fuel to the franchisee for resale." *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. LLC*, 559 U.S. 175, 178, 130 S. Ct. 1251, 1255, 176 L. Ed. 2d 36 (2010). [3]

Over time, however, the industry developed. Now, the typical structure for the sale of branded motor fuel is a three-tier relationship: "a refiner who contracts with a distributor to provide the distributor with motor fuel, which the distributor in turn sells to a retailer for sale to the general public. And pursuant to this structure, the retailer typically licenses from the refiner, or sublicenses from the distributor, the trademark that is owned or controlled by the refiner, in order to sell branded fuel to the public." *BP W. Coast Prods. LLC v. Crossroad Petroleum, Inc.*, No. 12CV665 JLS (KSC), 2012 WL 13124729, at *4 (S.D. Cal. Apr. 19, 2012). In a modern PMPA relationship, a lease is not typically part of the refiner-distributor tier, but is typically included only where there is a direct relationship with a retailer.

## III. The PMPA Franchise: The BPPMA-PMG Branded Jobber Contract

Here, BPPNA is a refiner and PMG is a distributor (and sometimes also a retailer) in the first tier of the modern structure described above. BPPNA's and PMG's refiner-distributor PMPA franchise relationship has existed for decades. PMG first entered into a branded jobber contract with BPPNA in the early/mid 2000s. (Rosenberger Decl. ¶ 3.)

---

[3] The PMPA was enacted primarily to protect "independent service station dealers." *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 921 (6th Cir. 1989).

In February 2022, BPPNA and PMG entered into their current Branded Jobber Contract (the "BJC"), which was being renewed. The BJC is the contract through which BPPNA authorizes PMG to use bp or Amoco trademarks in connection with the resale of motor fuel. It is, by PMG's own admission, the PMPA franchise. (Compl. ¶¶ 8; ECF #2-2 at 13, 21.)

Under the BJC, BPPNA grants PMG a license to use BPPNA's trademarks and agrees to supply PMG with bp- or Amoco-branded motor fuel for resale. (Rosenberger Decl. ¶ 4; Ex. A, BJC.) The BJC contains a list of approved retail sites at which PMG is authorized to use the trademarks ("Attachment A"). (Rosenberger Decl. ¶ 5; Ex. B.) When the BJC was renewed in 2022, more than 100 stations were approved in 6 states and the District of Columbia. (Rosenberger Decl. ¶ 5.) Put another way, prior to PMG and TA entering into the Sublease, PMG had a PMPA franchise contract with BPPNA that provided for the supply of fuel and licenses of the trademarks.

Sites are routinely added to and removed from the BJC's Attachment A in the ordinary course of business as operations change.

## IV. PMG Subleases Certain Equipment from TA

In 2023, more than a year after BPPNA and PMG entered the renewed BJC and decades after BPPNA and PMG began their PMPA franchise relationship, bp acquired TravelCenters of America, Inc. Following that acquisition, Maryland and Connecticut retail divorcement laws required that an independent retailer—not a refiner or its subsidiary—sell retail motor fuel at TA travel centers in those states. *See* Md. Code Ann., Bus. Reg. § 10-311; Conn. Gen. Stat. § 14-344c. To comply with these requirements, on June 15, 2023, TA and PMG negotiated and entered into the Sublease, with TA, as Lessor, and PMG, as Lessee. (Clancy Decl.; Ex. A, Sublease.) BPPNA is not a party to the Sublease.[4] The Sublease is exactly what its title says—an equipment

[4] The Sublease never references the BJC or the PMPA, and certainly it is not incorporated thereto.

lease and a services agreement. Under the Sublease, TA leased to PMG certain fuel dispensing equipment at six (6) travel center locations. Five of the six locations have two fueling portions at the sites: (1) a bp-branded canopy on the portion referred to by PMG as the "forecourt" (which at most of the sites is where both branded and unbranded fuel are sold) and (2) an unbranded portion at the back or another portion of the sites. (ECF #2-2 at 13-14; Bucaro Decl. ¶ 31; Clancy Decl. ¶ 6.)

As discussed below, PMG's request for injunctive relief appears to only apply to the branded fuel that PMG supplies and resells as bp-branded gas (not unbranded diesel also sold at the forecourt). The equipment that PMG leases at the sixth location does not sell bp-branded motor fuel, explaining why PMG has not included in its Complaint and request for injunctive relief. (Clancy Decl. ¶ 6.)[5]

PMG does not lease the entirety of the travel centers; it leases only the fuel dispenser equipment through which consumers pump motor fuel (and associated or necessary portions, including to reach/operate the equipment such as ingress/egress rights). Under the Sublease, PMG does not actually have employees present at the sites to operate the equipment. Instead, TA performs services to sell PMG's fuel to consumers, and PMG compensates TA for those services. (Clancy Decl. Ex. A, Sublease, § 2.4.)

### A. The Sublease Did Not Grant Trademarks and Left the Fuel Brand Undetermined

The Sublease covers the equipment at both the branded and unbranded areas indiscriminately. The Sublease's subject matter is physical equipment, not a trademark-based

[5] PMG's exclusion of the sixth site from its PMPA claims is a tacit admission that the portion of the Sublease pertaining to unbranded fuel portions of sites is not covered by the PMPA.

franchise relationship. The Sublease's terms expressly confirm that it is *not* a franchise or trademark license:[6]

> • In **Section 17.1**, PMG and TA agreed that: "This Agreement does not grant or license to Lessee any right to use trademarks, service marks or color schemes owned by, or licensed to, Lessor." (Clancy Decl. Ex. A, § 17.1.)
>
> • **Section 16.1** states that Lessor "exercises no control over the business operations of Lessee." (*Id.*)

The Sublease is a brand-agnostic equipment lease that covers fueling equipment without regard to what brand of fuel is sold. (Clancy Decl. Ex. A, § 3.2.) Indeed, the Sublease recognizes that fuel other than that bp-branded or bp-supplied may be sold at the equipment. *Id.*

B. <u>TA and PMG Agreed to a Three-Year Term for the Sublease</u>

PMG and TA specifically agreed to a fixed three-year term for the Sublease. Section 3.1 provides that the term commenced on August 1, 2023, and expires on August 31, 2026. Section 3.1 further provides that any renewal or extension is within Lessor's [TA's] "sole discretion." The Sublease provides PMG no right to renewal, nor any obligation on TA to renew. (Clancy Decl. Ex. A, Sublease, § 3.1.) Instead, the Sublease states that it "shall terminate upon the expiration of the Term…," and also provided TA the right to terminate mid-term without cause on written advance notice. (Clancy Decl. Ex. A, Sublease, § 14.1, § 14.2(c).)

Tellingly, PMG—a highly sophisticated company with extensive experience in PMPA franchise relationships—never, from the time it negotiated and entered the Sublease through April

[6] The PMPA does not convert every contractual arrangement between petroleum companies into a PMPA-protected franchise right. Courts, therefore, examine the parties' agreements to determine which contractual rights are part of the franchise relationship and which are independent contractual obligations. See *Han v. Mobil Oil Corp.*, 73 F.3d 872, 876-77 (9th Cir. 1995) (recognizing that franchise agreements may contain contractual arrangements not protected by the PMPA).

2026, referenced, mentioned, or contended that the Sublease was part of any PMPA franchise relationship with BPPNA.[7] (Rosenberger Decl. ¶ 13; Clancy Decl. ¶ 11.)

C. The Sublease Was Conditioned on Unfulfilled Rebranding Obligations

The Sublease was conditioned on PMG rebranding 32 locations to a BPPNA brand. Section 4.1 of the Sublease required PMG to convert 32 locations to the bp or Amoco brands:

> As a **condition of this Agreement**, Lessee shall cause the thirty-two (32) existing fuel station locations in the Baltimore market (the "Additional Sites") to become branded "BP" or "Amoco" on or before December 31, 2023, pursuant to the terms and conditions of a separate agreement…

Clancy Decl. Ex. A, Sublease, § 4.1 (emphasis added); Bucaro Decl., Ex. A (listing the 32 sites).

D. First Amendment to the Sublease

In early 2024, PMG indicated that it was not generating sufficient revenue from the TA sites. Rather than allowing PMG to bear the financial consequences, TA cooperated with PMG to restructure the Sublease on more favorable terms. In March 2024, TA and PMG executed a First Amendment to the Master Equipment Lease and Services Agreement, effective January 1, 2024 (the "First Amendment"). (Clancy Decl.; Ex. B, First Amendment.)

The First Amendment restructured the lease payment terms from a monthly rent structure to a per-gallon formula of $0.06 per gallon of fuel products sold, subject to a monthly floor of $205,000 and a monthly cap of $385,000. (First Amendment ¶ 8.) The First Amendment also provided PMG a 75% discount and reimbursement on certain TA loyalty programs. (First Amendment ¶¶ 6–7.)

[7]The Sublease also provides that "THE SOLE ENTITIES AGAINST WHICH LESSEE MAY SEEK DAMAGES OR ANY REMEDY UNDER LAW OR EQUITY FOR ANY CLAIM RELATING TO THIS AGREEMENT IS LESSOR AND ITS SUCCESSORS OR ASSIGNS," confirming the Sublease is an independent legal relationship with TA. (Clancy Decl. Ex. A, § 15.3(c).)

Critically, the First Amendment extended the conditioned Section 4.1 rebranding deadline from December 31, 2023 to December 31, 2024, giving PMG an additional year to convert 32 sites. (First Amendment ¶ 5.) PMG repeatedly promised that the conversions were in process and offered various explanations for delays for compliance with this condition. (Rosenberger Decl. ¶ 11.) As of the date of this filing, PMG has failed to convert 15 of the 32 sites—nearly half of its commitment—despite the fact that the deadline was extended. (Rosenberger Decl. ¶ 12.)[8]

## V. PMG and BPPNA Add Five (5) of the Sublease Sites to Attachment A to the BJC

A few months after TA and PMG entered their Sublease, in September 2023, the BJC's Attachment A was updated by BPPNA and PMG to add the five TA subleased locations to Attachment A as "Approved Retail Sites" to permit PMG to use the bp trademarks at, and supply bp-branded fuel to, those locations. (Rosenberger Decl. ¶ 6; Ex. C.)

Notably, Attachment A to the 2022 BJC renewal had 13 more sites than when Attachment A was updated in September 2023, indicating at least 13 sites were removed during the current term of PMG's BJC.[9] (Rosenberger Decl. ¶ 9; compare Ex. B with Ex. C.) Contrary to PMG's newly contrived position, PMG never asserted that removal of these sites resulted in an end to either the franchise (the BJC) or the franchise relationship (nor could they, as discussed below). The adjustment of Attachment A did not affect the continued existence of BPPNA's and PMG's franchise or their franchise relationship.

---

[8]On March 12, 2024, BPPNA and PMG executed an Amendment to the BJC (the "BJC Amendment"). (Rosenberger Decl. ¶ 10, Ex. D, BJC Amendment.) The BJC Amendment pertained to the licensing of trademarks and supply of fuel from BPPNA for those 32 sites, which were to be converted by December 31, 2024. (BJC Amendment ¶ 2(a).) PMG was permitted to substitute replacement sites only upon BPPNA's prior written consent, which could be "conditioned or withheld at [BPPNA's] sole discretion." (*Id.*) The BJC Amendment also updated the list of 32 sites that were to be converted to BPPNA brands.

[9] Based on Google maps, it appears that some of those removed approved locations are now unbranded or Sunoco or Shell branded.

To be clear, BPPNA and PMG never entered any separate BJC specific to only the leased equipment at the 6 TA sites, nor was the BJC amended to incorporate the Sublease. (Rosenberger Decl. ¶ 8.)

### VI. Expiration of the Sublease's Fixed Three-Year Term

On April 15, 2026, TA sent PMG a letter confirming that the Sublease would expire on August 31, 2026, in accordance with its terms. TA made the decision not to extend the term of the Sublease. (Clancy Decl. ¶¶ 9-10; Ex. C.) It was a confirmation of what the contract already stated: the lease would end on the date both parties agreed to when they signed it.

### VII. PMG's Continuing PMPA Franchise and Franchise Relationship with BPPNA

Following the expiration of the Sublease on August 31, 2026, PMG's PMPA franchise—through the BJC—and PMG's franchise relationship with BPPNA continues. Critically, the BJC will remain in full force and effect. After August 31, 2026, the BJC remains active, PMG will continue to hold a trademark license, continue to receive fuel supply from BPPNA, and continue to supply and operate bp and Amoco-branded locations at approved retail sites. (Rosenberger Decl. ¶ 16.) As of this filing, PMG has 133 Approved Retail Sites under the BJC, only 5 of which are part of the Sublease. (Rosenberger Decl. ¶ 14) As a result, PMG will continue to supply and/or operate bp- and Amoco-branded retail locations at its many sites across the Eastern United States, in the same form as when PMG entered the renewed BJC in 2022.

## ARGUMENT

Under 15 U.S.C. § 2805(b)(2), a court must grant a preliminary injunction if the franchisee establishes (1) "sufficiently serious questions going to the merits to make such questions a fair ground for litigation," and (2) "the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship

which would be imposed upon such franchisee if such preliminary injunctive relief were not granted." *Barnes v. Gulf Oil Corp.*, 824 F.2d 300, 304–05 (4th Cir. 1987).

## I. PMG Cannot Satisfy the Threshold Requirements for a Preliminary Injunction Under the PMPA.

Although the standard for an injunction under the PMPA is relaxed, it is not a rubber stamp. The franchisee must still demonstrate that the PMPA's threshold requirements are met—including, most critically, that there is a "franchise" as defined by the statute, that a "termination" of the "franchise" or "nonrenewal" of the "franchise relationship" has occurred, and that the defendant against whom relief is sought is the "franchisor." *See Patel v. Sun Co. Inc.*, 63 F.3d 248, 252 (3d Cir. 1995); *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388, 1390 (9th Cir. 1986) (the PMPA is the "product of compromise" that does not grant franchisees unlimited rights). The PMPA "should not be interpreted to reach beyond its original language and purpose." *Beachler v. Amoco Oil Co.*, 112 F.3d 902, 906 (7th Cir. 1997) citing *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d 917, 921 (6th Cir.1989). PMG fails to satisfy these threshold requirements because the Sublease is not the PMPA franchise, TA is not PMG's franchisor, and PMG seeks relief extending beyond the franchise rights protected by the statute.

### A. <u>The Sublease Is Not the "Franchise" Under the PMPA.</u>

The PMPA deliberately distinguishes between a "franchise" and a "franchise relationship." The PMPA defines "franchise" as a "**contract**" "between a refiner and a distributor or retailer" under which "a refiner or distributor . . . **authorizes or permits** a retailer or the distributor to use, in connection with the sale, consignment, or distribution of motor fuel, **a trademark** which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor." 15 U.S.C. § 2801(1)(A) (emphasis added). The Sublease does not fall within this definition.

#### ***1. The Sublease does not authorize use of BPPNA's trademarks.***

Under the PMPA, a "franchise" cannot exist without an authorization to use a refiner's trademark. *See Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 849–50 (7th Cir. 2002); *Checkrite Petroleum, Inc. v. Amoco Oil Co.*, 678 F.2d 5, 7-8 (2d Cir. 1982) (holding PMPA definitions must be strictly construed).

There is no dispute here that the agreement authorizing PMG's use of BPPNA's trademarks is the BJC. (ECF #2-2 at 13.) PMG itself identifies the BJC as the operative PMPA franchise. The BJC was executed by BPPNA and PMG, governs trademark use and fuel supply, predated the Sublease by more than a year, and remains in effect after the Sublease expires. (Rosenberger Decl. ¶¶ 4, 16.)

By contrast, the Sublease expressly disclaims any trademark authorization. Section 17.1 provides that the Sublease "does not grant or license" any right to use trademarks. Ex. A, § 17.1. The Sublease likewise does not require BPPNA-branded fuel and expressly contemplates circumstances in which other fuel brands may be sold through the equipment. *Id.* at Ex. A, § 3.2. The agreement therefore lacks the hallmark statutory feature of a PMPA franchise: authorization to use a refiner's trademark in connection with motor-fuel sales.

PMG's theory depends on treating two separate agreements, executed by different parties for different purposes, as a single PMPA franchise. But the BJC and the Sublease serve entirely different functions. The BJC governs trademark rights and fuel supply between BPPNA and PMG. The Sublease is an equipment lease and services agreement between TA and PMG.[10] It contains no trademark grant, no fuel-supply obligation, and no incorporation of the BJC. (Clancy Decl. ¶ 5.)

---

[10] The title of the Sublease further confirms its purpose: "Master Equipment Lease and Services Agreement."

The structure and terms of the Sublease likewise confirm that it is a separate commercial arrangement rather than part of the PMG-BPPNA franchise relationship. Unlike the BJC, the Sublease: (1) was executed by a different entity (TA); (2) was entered more than a year after the current BJC; (3) expressly disclaims trademark rights (Section 17.1); (4) contains no fuel-supply obligations; (5) allows for the supply of any brand fuel (Section 3.2); and (6) does not incorporate the BJC. (Clancy Decl. ¶¶ 5, 12.) It is a stand-alone commercial arrangement rather than a component of the PMG-BPPNA franchise relationship. *Cf. May-Som Gulf*, 869 F.2d at 921 (discussing the PMPA was designed to address the unique power dynamic of the franchisor-franchisee relationship involving independent station dealers).

Courts have consistently distinguished between contracts that form part of a PMPA franchise and supplemental or ancillary contracts that do not. The key inquiry is whether the ancillary contract is expressly made part of the franchise—not merely related to the same business relationship. Only those secondary arrangements that are "essential to the operation of a motor fuel franchise" fall within the statute's protection. *Smith v. Atlantic Richfield Co.*, 533 F. Supp. 264, 268 (E.D. Pa. 1982). Congress did not intend the PMPA's broader definition of franchise to "encompass other contractual arrangements which may exist between a franchisor and a franchisee." *Id.* How could the Sublease be an "essential" component of the franchise if the franchise between PMG and BPPNA existed for years prior to the Sublease and will continue after the expiration of the Sublease?

Courts, therefore, look for evidence that a secondary agreement has been incorporated into or made part of the franchise relationship itself, rather than simply arising from the same commercial relationship. *See Han v. Mobil Oil Corp.*, 73 F.3d 872, 876-77 (9th Cir. 1995) ("Gasoline station franchise agreements may contain contractual arrangements that are not

protected by [the] PMPA."). By contrast, where courts have found a secondary agreement to be part of the franchise relationship, the agreement itself was expressly incorporated into the franchise. *In re Ramreddy, Inc.*, 440 B.R. 103 n.6 (2009) (finding integration where lease expressly stated it was "part of, and incorporated into, the PMPA Franchise Agreement"). No such language exists here.

### *2. The TA Sites' Equipment Are Not "Leased Marketing Premises" Controlled by BPPNA*

Although the term "franchise" under the PMPA can also include a "contract" authorizing occupancy of "leased marketing premises," 15 U.S.C. § 2801(1)(B), the Sublease does not pertain to a "leased marketing premises" as defined in the PMPA.

The PMPA defines "leased marketing premises" as "marketing premises owned, leased, or in any way **controlled** by a **franchisor** and which the **franchisor leases** or otherwise makes available to a franchisee." 15 U.S.C. § 2801(9) (emphasis added). The statutory definition thus focuses on premises that are owned, leased, controlled, or made available by the franchisor.

That is not what occurred here. The Sublease is between TA and PMG. BPPNA is not a party to the Sublease, does not lease the equipment or premises to PMG, and does not grant PMG possession of the TA sites. (Clancy Decl. ¶¶ 5, 12.) The only contract under which BPPNA grants rights to PMG is the BJC. (Rosenberger Decl. ¶ 4.) As discussed above, the Sublease expressly disclaims any trademark authorization and contains no fuel-supply obligations. PMG cannot simply ignore that the PMPA's authorization for injunctions applies only to "franchisors." *See* 15 U.S.C. § 2805.

Nor can PMG avoid the fact that the PMPA's protections run through the franchisor-franchisee relationship. The PMPA defines a "franchisor" as a refiner or distributor that "authorizes or permits" a retailer to use a trademark in connection with the sale of motor fuel. 15

U.S.C. § 2801(3). Even assuming TA qualifies as an affiliate of a refiner under the PMPA, 15 U.S.C. § 2801(5), TA is not a "franchisor" in the Sublease because it does not authorize any trademark rights. To the contrary, the Sublease expressly disclaims any trademark authorization. (Clancy Decl. Ex. A, Sublease, § 17.1.)[11] PMG cannot evade this statutory requirement by unilaterally attempting to incorporate the Sublease into the BJC, which no terms provide for.

PMG itself alleges that BPPNA is its franchisor. (ECF #2-2 at 26.) But the PMPA's definition of "leased marketing premises" contemplates premises "controlled" by the "franchisor leas[ing]" it. TA is not a "franchisor" as defined in the PMPA, and TA, not BPPNA, leases the five locations.

Further, the leased equipment is not owned, leased, or controlled by BPPNA. TA holds the leasehold interest in the TA properties from third-party landowners. (Clancy Decl. ¶¶ 5, 12.) PMG's argument that BPPNA has "control" through its corporate ownership of TA conflates two distinct concepts: corporate ownership of a subsidiary and property control. Corporate ownership of a subsidiary does not, without more, establish that the parent "controls" the subsidiary's property for purposes of a specific statutory definition. *See generally Dole Food Co. v. Patrickson*, 538 U.S. 468, 474–75 (2003), *superseded in part by statute on other grounds* (subsidiaries are separate juridical entities; ownership does not collapse the corporate form).

PMG also suggests that BPPNA "controls" the premises through brand standards imposed under the BJC. But standard brand-image requirements in a fuel supply agreement—here the BJC—do not convert a landlord's premises into property "controlled by" the refiner within the meaning of § 2801(9). The PMPA's "control" requirement for leased marketing premises is

[11] As detailed above, the Sublease bears none of the characteristics courts typically rely upon when concluding that a secondary agreement forms part of a PMPA franchise relationship, including because it was entered more than a year after the BJC and contains no incorporation language.

directed at property interests—ownership, leaseholds, and similar possessory rights—not at franchisor trademark protection standards. *Cf. Jet, Inc. v. Shell Oil Co.*, No. 02 C 2289, 2002 WL 31641627 (N.D. Ill. Nov. 22, 2002) ("Control may make the affiliate a refiner under the act, but, to be a franchisor, a refiner must "authorize[ ] or permit[ ], under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel." 15 U.S.C. § 2801(3).").

The BJC itself confirms the distinction. It expressly provides that BPPNA does not have control over PMG's business, and prohibits any signage at a location suggesting that BPPNA owns or operates PMG's many locations. (Rosenberger Decl. Ex. A, BJC, § 10.) BPPNA's authority under the BJC relates to use of its trademarks (for protection of its intellectual property) and not possession or control of the TA sites. Indeed, the BJC expressly contemplates that PMG may supply disapproved or revoked locations as it wishes so long as it does not involve BPPNA's trademarks. (Rosenberger Decl. Ex. A, BJC, § 6(c).) BPPNA's brand standards are intended to protect its trademarks—not to exercise control over the physical locations covered by the BJC.

Additionally, the statutory definition addresses physical occupancy of a retail location, not the mere use of discrete equipment at premises owned and operated by another entity. 15 U.S.C. § 2801(1)(B)(i). The PMPA reinforces this site-level understanding by treating "leased marketing premises" as a property that a franchisor may seek to "convert," "materially alter," "replace," or "sell." § 2802(b)(3)(D)(i). The Supreme Court has described the typical PMPA franchise in precisely these terms: an arrangement in which "the franchisor leases the service-station premises to the franchisee." *Mac's Shell*, 559 U.S. at 179.

Cases applying the three-component framework, including those cited by PMG ,involved a traditional motor fuel station in which the franchisee leased and operated an retail facility. *See,*

*e.g.*, *Mac's Shell*, 559 U.S. at 178–79; *Metroil*, 672 F.3d at 1111; *Dersch Energies*, 314 F.3d at 849–50; *Ellis v. Mobil Oil Corp.*, 969 F.2d 784 (9th Cir. 1992); *Svela v. Union Oil Co. of Cal.*, 807 F.2d 1494 (9th Cir. 1987); *May-Som Gulf*, 869 F.2d at 918–19; *Clark v. BP Oil Co.*, 137 F.3d 386 (6th Cir. 1998). We have been unable to find application of the PMPA's leased marketing premises framework to a lease for only discrete fueling equipment. "[M]arketing premises" under the PMPA is evaluated in its ordinary sense, including as a "building together with its grounds or other appurtenances." *Shell Oil Co. v. Hillary Farmer Serv. Station, Inc.*, 739 F. Supp. 749, 753 (E.D.N.Y. 1990).

Accordingly, PMG has not shown that the Sublease involves "leased marketing premises" leased, controlled, or made available by a franchisor within the meaning of the PMPA.

B. The PMPA Does Not Authorize Injunctive Relief Against TA

No injunction can issue against TA because the PMPA authorizes suit ***only*** against a franchisor. The PMPA's private right of action provides that "a franchisee may maintain a civil action against *such franchisor*." 15 U.S.C. § 2805(a) (emphasis added). The statute's remedial provisions—including the preliminary injunction provision at § 2805(b)—are directed exclusively at the "franchisor."

As discussed above, TA is not a "franchisor" under the PMPA. The statute defines "franchisor" to mean "a refiner or distributor . . . who authorizes or permits . . . a retailer or the distributor to use" a trademark "in connection with the sale . . . of motor fuel." 15 U.S.C. § 2801(1)(A). TA does not authorize use of the BPPNA trademarks, and the Sublease expressly disclaims any trademark grant. (Clancy Decl. Ex. A, Sublease, § 17.1.) PMG itself repeatedly identifies BPPNA, not TA, as the entity that grants trademark rights and serves as the franchisor.

The PMPA requires a direct contractual franchise relationship between the defendant and the plaintiff before PMPA liability may attach. *Hutchens*, 838 F.2d at 1144 (holding that the

PMPA requires a "direct contractual relationship"). The only direct contractual relationship between TA and PMG is the Sublease, which expressly disclaims trademark rights and creates no franchise relationship under the PMPA. (Clancy Decl. ¶ 5.)

Courts have consistently rejected efforts to impose PMPA liability on affiliated entities that did not themselves authorize trademark use. *Jet, Inc. v. Shell Oil Co.*, No. 02 C 2289, 2002 WL 31641627 (N.D. Ill. Nov. 22, 2002) squarely addresses—and rejects—the theory PMG advances here to conflate different entities. In *Jet*, five Shell-brand gas station franchisees sued Shell Oil Company, Equilon Enterprises (the Shell-affiliated entity that had been assigned their franchise agreements), and Equiva Services (a shared-services administrative company). *Id.* at *1. The franchisees alleged that Shell and Equiva were "franchisors" under the PMPA because they were affiliates of Equilon—Shell owned 56% of Equilon (and later acquired full ownership), and Equiva was largely controlled by Equilon and Shell. *Id.* at *1–2. The franchisees' theory was that because Shell and Equiva "controlled" Equilon, they qualified as affiliated "refiners" under § 2801(5) and therefore as "franchisors" under the Act. *Id.* at *6.

The court rejected that theory, drawing a critical distinction between control (which may make an entity an affiliate and therefore a "refiner" under the Act) and trademark authorization (which is the additional, independent requirement for "franchisor" status). The court held: "Although control is necessary for an affiliate to be considered a "franchisor" under the PMPA, it is not sufficient. Control may make the affiliate a refiner under the Act, but, to be a franchisor, a refiner must 'authorize[] or permit[], under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.' 15 U.S.C. § 2801(3)." *Id.* at *6. Instead, the court concluded that there were no allegations that Shell or Equiva authorized the plaintiff to use the Shell trademark and therefore the "contention that they fit within the

PMPA's definition of franchisor" failed. *Id.; see also Patel v. Sun Co.*, 63 F.3d 248 (3d Cir. 1995) ("the application of the PMPA is limited to causes of action arising between franchisees and franchisors"); *Yogi Krupa, Inc. v. GLeS, Inc.*, No. 22-226-CFC, 2022 WL 16834164, at *1 (D. Del. Nov. 9, 2022) ("the PMPA only authorizes civil actions against a franchisor."); *Sammy's Mem'l Texaco, Inc. v. Chevron U.S.A., Inc.*, No. CIV.A. H-06-1543, 2006 WL 2559649 (S.D. Tex. Sept. 5, 2006) ("[b]ecause the PMPA only permits civil suits by franchisees against franchisors, Sammy's current action against Chevron and Motiva, neither of whom is Sammy's franchisor, is not authorized under the statute").

The same reasoning applies here. Even assuming TA qualifies as an affiliate of BPPNA, neither affiliate status nor corporate ownership satisfies the statutory definition of "franchisor." To qualify as a franchisor, TA must have "authorize[d] or permit[ted]" PMG "to use a trademark in connection with the sale . . . of motor fuel." 15 U.S.C. § 2801(3). TA did not do so as confirmed by the Sublease expressly disclaiming any trademark authorization. (Clancy Decl. Ex. A, Sublease, § 17.1.)

Other courts have recognized the same limitation. The PMPA's application is "limited to causes of action arising between franchisees and franchisors." *Patel*, 63 F.3d at 253. Likewise, "the PMPA only authorizes civil actions against a franchisor." *Yogi Krupa*, 2022 WL 16834164, at *1. And because "the PMPA only permits civil suits by franchisees against franchisors," claims against entities that are not the plaintiff's franchisor are "not authorized under the statute." *Sammy's Mem'l Texaco*, 2006 WL 2559649, at *2.

Even PMG's own allegations repeatedly identify BPPNA—not TA—as the "franchisor" and the entity that grants its trademark rights. (Bucaro Decl. ¶¶ 7–18, 46–60.) TA acted solely as the equipment lessor. Even if TA is an "affiliate" under 15 U.S.C. § 2801(15), affiliate status does

not independently convert one to a "franchisor" as defined in the PMPA. The statute defines "affiliate" for definitional purposes but does impose the definition of "franchisor" on every corporate affiliate. PMG fails to show that TA falls within the independent trademark authorization requirement for the definition of "franchisor," which *Jet* held is the sine qua non of franchisor status.

PMG attempts to avoid these statutory limitations through Rule 19(a)(1)(A), arguing that TA is a necessary party to afford "complete relief." But Rule 19 is a procedural joinder rule—it does not create substantive rights or expand the scope of the PMPA or create liability where Congress did not authorize it. *See Beachler*, 112 F.3d at 904 (noting the PMPA "should not be interpreted beyond its original language and purpose."). The PMPA permits suit only against a "franchisor." 15 U.S.C. § 2805(a). Courts have likewise recognized that PMPA rights and remedies are limited to the franchisor-franchisee relationship created by the statute. *See Patel v. Sun Co.*, 63 F.3d 248, 253 (3d Cir. 1995) ("the application of the PMPA is limited to causes of action arising between franchisees and franchisors"); *Service Road Gulf, Inc. v. Gulf Oil Corp.*, 624 F. Supp. 496, 499 (D. Conn. 1986) ("In the same way that a contract cannot exempt a franchisor from PMPA obligations, neither can a contract create them."). Nor does the PMPA implicitly authorize relief against parties outside the relationship identified by Congress. *See Interstate Petroleum Corp. v. Morgan*, 249 F.3d 215, 219-20 (4th Cir. 2001) ("the grant of jurisdiction by a statute to one party to a transaction does not imply jurisdiction to other parties"). Thus, even if TA's presence were necessary for complete relief, Rule 19 cannot create PMPA liability or authorize PMPA injunctive relief against an entity that does not independently qualify as a franchisor.

C. <u>No "Nonrenewal" of the "Franchise Relationship" Will Occur.</u>

PMG's claim fails for a separate reason: expiration of the Sublease does not result in a "nonrenewal" of PMG's and BPPNA's franchise relationship. (*See* ECF #2-2 at 6, 7 (alleging "nonrenewal" and "the franchise relationship will end on August 31, 2026".) The PMPA defines nonrenwal as the "failure to reinstate, continue, or extend the franchise relationship." 15 U.S.C. § 2801(14)(A); § 2802(a)(2), (b)(2), (b)(3). A "franchise relationship," in contrast to the definition and treatment of "franchise" under the PMPA, means the respective motor fuel marketing or distribution obligations and responsibilities that result from the marketing of motor fuel under a franchise. 15 U.S.C. § 2801(2).

Accordingly, the PMPA's nonrenewal provisions focus on continuation of the franchise relationship, not every individual contract that commercial parties may enter into while operating in the petroleum industry. *See Han v. Mobil Oil Corp.*, 73 F.3d 872, 876 (9th Cir. 1995) ("The significance of this distinction is that the franchisor must renew the franchise relationship, not the franchise agreement *per se,* under the PMPA. ... Indeed, the PMPA contemplates changes in the specific provisions of the franchise agreement at the time of renewal, requiring renewal only of the franchise relationship as distinguished from a continuation or extension of the specific provisions of the franchise agreement." (citation omitted)); *Jet, Inc.*, 2002 WL 31641627, at *3 ("The PMPA therefore does not require that all the provisions of a franchise agreement be continued when that agreement is renewed; franchisors are free, within the limitations imposed by § 2802(b)(3)(A), to introduce, and insist upon, changes to the franchise relationship. This is true even if franchisees find these changes disadvantageous." "The plain language of the statute

contemplates an actual ending of the franchise relationship and therefore does not support a cause of action for constructive termination.").[12]

Here, the franchise relationship both predates and survives the Sublease. BPPNA's and PMG's franchise relationship existed long before the Sublease, and the BJC remains in effect following the Sublease's expiration. (Rosenberger Decl. ¶¶ 3, 16.) Thus, the same franchise relationship that existed before the Sublease will continue after August 31, 2026.

PMG's own allegations confirm as much. PMG alleges that it has maintained a longstanding branded-fuel relationship with BPPNA under the BJC and that the equipment lease at the TA sites were later added to that relationship. But after expiration of the Sublease, PMG will continue to have the same core franchise relationship that it had before the TA sites were added to Attachment A. PMG will continue to possess trademark rights, continue to purchase and receive BPPNA-branded fuel, and continue to operate and supply more than 100 bp- and Amoco-branded locations. (Rosenberger Decl. ¶¶ 14, 16.) Accordingly, the franchise relationship does not end when the Sublease expires, which is fundamentally at odds with PMG's allegation of nonrenewal of the franchise relationship.

The history of the franchise relationship further demonstrates that individual site authorizations are distinct from the franchise relationship itself. The TA sites were not part of PMG's original franchise relationship with BPPNA. They were added years later through modification of Attachment A to the BJC in September 2023. (Rosenberger Decl. ¶ 8.) Likewise, locations have routinely been added to and removed from Attachment A without ending the parties' franchise relationship. (Rosenberger Decl. ¶ 6.) Indeed, between 2021 and 2023 alone, at

[12] For these reasons, if the Court determines that somehow the Sublease is subject to the PMPA, TA will have the option to provide new terms.

least 13 locations were removed from Attachment A without PMG contending that its franchise relationship with BPPNA had been nonrenewed. (Rosenberger Decl. ¶ 9.)

The BJC itself contemplates exactly this: Section 6(b) on "Site approval revoked" provides that BPPNA may revoke its approval of individual Approved Retail Sites, which never resulted in a nonrenewal of the BJC. (Rosenberger Decl. Ex A.) The agreement therefore recognizes the distinction between continuation of the overall franchise relationship and changes to the particular locations approved for branding at any given time—as opposed to 100 individual PMPA relationships captured in one agreement. Because license of the trademarks and supply of fuel by BPPNA continues, PMG cannot show a "nonrenewal" under the PMPA.

Following expiration of the Sublease, PMG remains in the same position it occupied before those locations were added. After August 31, 2026, PMG will continue to:

• Have a license for BPPNA's trademarks at approved retail locations;

• Receive motor fuel supply from BPPNA; and

• Operate and/or supply more than 100 bp- and Amoco-branded retail locations. (Rosenberger Decl. ¶¶ 14, 16.)

PMG's theory improperly conflates the expiration of a separate equipment Sublease with the nonrenewal of the franchise relationship itself. But "[t]he franchisor must renew the franchise relationship, not the franchise agreement per se." *Han*, 73 F.3d at 876. Here, the franchise relationship remains intact. The only agreement expiring is a separate Sublease between PMG and TA. Because the parties' trademark licensing and fuel-supply relationship continues after August 31, 2026, PMG cannot establish a "failure to reinstate, continue, or extend the franchise relationship" within the meaning of the PMPA. 15 U.S.C. § 2801(14)(A).

Nor can PMG show that expiration of the Sublease will "put an end to" the franchise relationship. *See Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.*, 559 U.S. 175, 182, 187 (2010). After August 31, 2026, PMG remains a BPPNA jobber, remains authorized to use BPPNA trademarks at approved locations, and remains a purchaser of BPPNA-branded fuel under the BJC. (Rosenberger Decl. ¶ 16.) The franchise relationship therefore continues exactly where the PMPA requires it to continue: between PMG and its franchisor, BPPNA.

Accordingly, even upon expiration of the Sublease, PMG fails to show any "nonrenewal" of the "franchise relationship." Thus, under PMG's own allegations, the franchise relationship both predates and survives the Sublease.

## II. PMG Fails to Meet the Standard for Injunctive Relief under the PMPA

### A. PMG Fails to Raise Sufficiently Serious Questions Going to the Merits

For the reasons discussed above, PMG fails to raise "sufficiently serious questions going to the merits" as required by 15 U.S.C. § 2805(b)(2)(A). Even viewed in the light most favorable to PMG, its theory fails to present a viable PMPA claim. Critically, the BJC remains in effect and the franchise relationship between BPPNA and PMG has not been nonrenewed. (Rosenberger Decl. ¶ 16.) Instead, PMG's theory requires the Court to accept a contradictory proposition that the PMPA franchise (the BJC) continues in full force *and* simultaneously PMG is being "nonrenewed." That is not a sufficiently serious question going to the merits.

### B. The Balance of Hardships Does Not Favor PMG

Even under the PMPA's relaxed standard, the Court must determine whether "the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted." 15 U.S.C. § 2805(b)(2)(B). The balance of hardships here favors Defendants.

*Harm to Defendants from an injunction.* Granting PMG's requested relief would force TA to extend a commercial beyond its agreed expiration date, infringe on TA's contractual and property rights, and prevent TA from exercising its fundamental right to manage its own business operations.[13] (Clancy Decl. ¶ 13.) Such relief would not preserve the status quo; it would alter the parties' negotiated contractual relationship by forcing continuation of rights that expire on their own terms. It would take the Sublease and apportion it out in two ways under PMG's request—neither of which is contemplated by its terms—(1) narrow the Sublease to equipment at 5 sites instead of 6 and (2) separate out when the equipment is associated with unbranded versus branded fuel.

*PMG's alleged harm is quantifiable and compensable.* PMG's claimed hardship is economic in nature. PMG's alleged lost profits from motor fuel sales are entirely quantifiable. This is relevant to the Court's balancing of hardships because PMG is a large, sophisticated fuel distributor operating more than 1,200 locations, not a small dealer facing the loss of its livelihood. *See May-Som Gulf*, 869 F.2d at 921. Although PMG points to its investment in reimaging locations, PMG admits that BPPNA contributed more than $2.4 million toward those efforts. (Bucaro Decl. ¶ 38.) Any remaining economic impact is similarly measurable.

*PMG is not facing existential harm.* Congress enacted the PMPA to address the plight of the small, local dealer facing the loss of its livelihood at the hands of a refiner. *See* S. Rep. No. 95-731, 95th Cong., 2d Sess. 15 (1978). PMG is a sophisticated commercial entity with decades of experience, substantial financial resources, hundreds of employees, and a multistate operational footprint. PMG is a massive operation that:

[13]Notably, in the 2024 BJC Amendment, PMG agreed to terms that refer to expiration of the Sublease and TA's ability to terminate the Sublease without cause—directly contrary to its new contention that the Sublease is part of the PMPA franchise. (Rosenberger Decl. Ex. D.)

- Publicly describes itself as one of the largest fuel distributors in the Eastern United States;
- Employs more than 600 industry professionals;
- Supports a network of more than 1,200 sites across multiple brands; and
- Operates in 19 states.

The loss of five locations out of more than 1,200—while PMG's PMPA franchise with BPPNA (the BJC) and its franchise relationship continues—does not constitute the kind of disproportionate hardship that warrants extraordinary equitable relief. Notably, PMG is not even operating the equipment at the 5 TA sites (it pays TA a fee for TA to do so). Under the Sublease, TA performs the site-level services while PMG supplies fuel, sets retail fuel prices, and receives the margins collected from the fuel it sells to consumers. (Clancy Decl. Ex. A, Sublease, § 2.4.)

Accordingly, PMG cannot demonstrate that the balance of hardships favors it.

## III. The PMPA Does Not Permit Any Injunction Related to Unbranded Fuel

PMG's request risks an order issuing injunctive relief that is substantially broader than the rights protected by the PMPA. PMG's proposed order fails to appropriately carve out portions of the Sublease that pertain to unbranded fuel. The proposed order appears to concede this point by requesting a prohibition of "remov[ing] or replac[ing] Plaintiff as the operator of the BP branded retail motor fuels businesses at the Maryland and Connecticut TA Travel Centers…" (ECF #2-1). Yet, the proposed order then goes on to broadly request a prohibition on BPPNA and TA from "interfere[ing] directly, or indirectly…with Plaintiff's occupancy of the Travel Centers, including without limitation any action under the Master Lease and Services Agreement, dated June 15, 2023, (the "Sublease") designed to amend the terms and conditions of the Sublease to end or limit Plaintiff's tenancy in any way…" and an order "affirmatively enjoin[ing them] to continue and extend the term of the Sublease…" *Id.*

That breadth is incompatible with the PMPA. PMG acknowledges that "[t]he Sublease does cover a separate truck-fueling area at each travel center where unbranded diesel fuel is sold." (Compl. ¶ 7.) That area bears none of BPPNA's trademarks or brand identifications, and no motor fuel purchased under the BJC from BP is sold there." (Bucaro Decl. ¶ 31.) Similarly, the diesel sold in the forecourt is likewise unbranded (except for one station). (Clancy Decl. ¶ 6.) Only the branded gas sold on the fuel court is actually branded. (*Id.*) Also, as PMG's filing concede, it is not seeking relief as to the sixth site under the Sublease, where no branded fuel is sold.

The PMPA is a trademark-based statute. It protects the sale, consignment, or distribution of motor fuel "in connection with" a franchisor's trademark. 15 U.S.C. § 2801(1)(A), (1)(B). Accordingly, courts have consistently recognized that the PMPA does not extend to unbranded fuel operations. *DG Gas, LLC v. TA Franchise Sys. LLC*, No. 1:24-CV-01002-PAB, 2025 WL 814928, at *16 (N.D. Ohio Mar. 14, 2025) ("It is well-established that the PMPA does not apply to unbranded fuel."); *Catch 26, LLC v. LGP Realty Holdings, LP*, No. 17-CV-6135, 2017 WL 4864856, at *3 (N.D. Ill. Oct. 27, 2017) (denying PMPA injunctive relief for unbranded stations and limiting injunction to branded location).

Consequently, the Court lacks authority to enter any injunctive relief under the PMPA to compel continuation of the Sublease as it relates to unbranded diesel fuel operations at the TA sites. Those operations involve no BPPNA trademark, no bp-branded fuel, and no rights conferred under the BJC. TA should be free to Sublease equipment associated with unbranded fuel as it wishes, even under PMG's own arguments.

PMG's own pleading strategy confirms this limitation. Although the Sublease covers equipment at six TA locations, only five are covered by the BJC for bp-branded supply and PMG seeks injunctive relief as to only those five. The sixth location sells only unbranded fuel. (Clancy

Decl. ¶ 6.) For the same reason, PMG cannot invoke the PMPA to reach the unbranded diesel areas under the Sublease.

Accordingly, if the Court grants any relief, it should be limited to the rights actually protected by the PMPA and should expressly exclude all aspects of the Sublease related to unbranded fuel.[14]

### IV. If the Court Grants Any Injunctive Relief, It Should Require a Substantial Bond

Should the Court grant any preliminary injunctive relief, it should require PMG to post security, pursuant to 15 U.S.C. § 2805(b)(3) and Rule 65(c). "In fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Hoechst Diafoil Co. v. Nan Ya Plastics, Inc.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).

Here, a substantial bond is warranted. An injunction compelling TA to maintain the Sublease beyond its negotiated expiration date would cause significant harm. (Clancy Decl. ¶ 13.) Defendants respectfully request that the Court set a bond in an amount sufficient to cover these losses for the duration of any injunctive relief.

## CONCLUSION

For the foregoing reasons, BPPNA and TA respectfully request that this Court deny Plaintiff's Motion for a Preliminary Injunction in its entirety. No nonrenewal of the franchise relationship has occurred—PMG stands in the same position on September 1, 2026 that it did prior to the Sublease with licensed trademarks and fuel supply under the BJC.

---

[14] It is worth noting that this also confirms the Sublease is not part of a PMPA franchise—it is a commercial equipment lease that happens to relate to the equipment used for the sale of branded fuel authorized separately under the BJC.

In the alternative, to the extent the Court is inclined to grant any relief, it is inappropriate to issue injunctive relief under the PMPA related to unbranded fuel and against a non-franchisor (TA). Defendants respectfully request that the Court (a) decline to extend any relief as to unbranded fuel; and (b) decline to extend any relief to TA, who is not a "franchisor" under the PMPA; and (c) require PMG to post a substantial bond.

Respectfully submitted,

___*/s/ Abby L. Risner*__________
Abby L. Risner *(pro hac vice)*
UB Greensfelder LLP
10 South Broadway, Floor 20
St. Louis, MO 63102
(314) 345-4785
(314) 345-4245 Fax
arisner@ubglaw.com

___*/s/ Casey D. Brinks*___________
Casey D. Brinks, Bar No. 30410
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, MD 21202
Telephone: 410-752-9700
Facsimile: 410-727-5460
cbrinks@tydings.com

***Counsel for Defendants***
***BP Products North America, Inc.***
***and TA Operating LLC***

Dated: August 21, 2026

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 21st day of August, 2026, the foregoing Defendants' Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction to be served via the Court's CM/ECF system upon all counsel of record.

___*/s/ Casey D. Brinks*__________
Casey D. Brinks, Bar No. 30410