**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| PETROLEUM MARKETING GROUP, INC., | * | |
| *Plaintiff*, | * | |
| v. | * | Civil Action No. RDB-26-3084 |
| BP PRODUCTS NORTH AMERICA, INC. ET AL, | * | |
| *Defendants*. | * | |

* * * * * * * * * * * * *

## MEMORANDUM OPINION

Plaintiff Petroleum Marketing Group, Inc. ("PMG") brings this action against franchisor Defendant BP Products North America, Inc. ("BP") and its affiliate, TA, Operating, LLC ("TA"), alleging violations of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801*, et seq*. (the "Act" or "PMPA") for BP's allegedly unlawful nonrenewal of a sublease, under which PMG operates certain BP-branded motor fuel businesses; and failure to provide notice of the nonrenewal in accordance with the Act. (Compl., ECF No. 1 at 1-2, Counts I-II).[1] Currently pending before the Court is Plaintiff's Motion for a Preliminary Injunction by which Plaintiff seeks to continue PMG's sublease with TA, in addition to the location-specific trademark licenses and fuel sales. (ECF No. 2). The Court has reviewed the Parties' filings, and on August 26, 2026, heard oral argument from the Parties. For the reasons set forth on the record and elaborated below, Plaintiff's Motion for a Preliminary Injunction

[1] The Complaint also includes a separate Count III, which states that joinder of TA is required under Federal Rule of Civil Procedure 19(a)(1)(A). (Compl. at 11).

(ECF No. 2) is GRANTED. However, the Court narrows the scope of the requested injunction so that it only applies to the five BP-branded motor fuel businesses at issue.

**BACKGROUND**

Plaintiff Petroleum Marketing Group, Inc. ("PMG") is a wholesale distributor and retailer of motor fuels, which it sells under the "BP" and other trademarks over a network of 1,200 gas stations on the East Coast. *See* https://petromg.com/about/history/. (ECF No. 2-2 at 4; ECF No. 24 at 4).

Defendant BP Products North America, Inc. ("BP") is an integrated refiner and marketer of motor fuels throughout the United States under trademarks "BP" and "Amoco." (ECF No. 24 at 4). Defendant TA Operating, LLC ("TA") operates and franchises travel centers in multiple states under the "TA" (TravelCenters of America) and "Petro" brands. The sole member of TA Operating LLC is TravelCenters of America Inc., which is an indirect wholly-owned subsidiary of BP. (ECF No. 24 at 4).

This litigation arises from BP's decision directing TA to non-renew PMG's Sublease with TA with respect to the five travel center locations in Maryland and Connecticut (collectively, the "Travel Centers").[2] (ECF No. 2-2 at 1, 22 (citing Decl. Bucaro ¶¶ 47-48, 67-69, 74-76)). TA did not offer PMG a renewal of the Sublease upon its stated expiration on August 31, 2026. (Compl. ¶ 2). PMG alleges, as a threshold matter, that its Sublease with TA is part of its franchise relationship with BP, and that the Sublease is therefore subject to the

[2] The five Travel Centers are located at the following addresses: 1875 Meriden Waterbury Turnpike, Milldale, CT 06467; 3 East Industrial Road, Branford, CT 06405; 327 Ruby Road, Willington, CT 06279; 1400 Elkton Road, Elkton, MD 21921; and 7401 Assateague Drive, Jessup, MD 20794. (ECF No. 2-3, Decl. Bucaro ¶ 3).

limitations on nonrenewal under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801*, et seq*. (the "Act"). (*See* Compl. ¶¶ 18-22; ECF No. 2-2 at 11-13). Accordingly, Plaintiff alleges that the nonrenewal of the Sublease violated the Act because (1) the nonrenewal was not supported by any of the permissible grounds for nonrenewal under 15 U.S.C. § 2802(b); and (2) BP failed to provide PMG with the requisite notice for nonrenewal under 15 U.S.C. §2804, which requires, among other things, a statement of one or more of the grounds set forth in the Act under which a nonrenewal is permissible. (Compl. ¶¶ 26, 27). The Court provides a factual summary of the Parties' dealings and the relevant agreements below.

**A. The Branded Jobber Contract** (BP and PMG)

BP and PMG have shared a refiner-distributor relationship since the early or mid 2000s. (ECF No. 24 at 5 (citing Decl. Rosenberger ¶ 3)). On February 4, 2022, PMG and BP entered their current Branded Jobber Contract ("BJC"). (Compl. ¶ 8; ECF No. 24 at 6). The BJC contains two main components: (1) BP was required to sell certain minimum quantities of gasoline to PMG at each site, and (2) PMG was authorized to use BP's trademarks at the approved retail sites listed on Attachment A to the contract. (Compl. ¶ 8; ECF No. 2-2 at 6-7; ECF No. 2-3, Decl. Bucaro, Ex. B; ECF No. 24 at 6; ECF No. 24-1, Decl. Rosenberger, Ex. A).

The BJC contains no single, generalized trademark authorization or license. (ECF No. 2-2 at 7; ECF No. 2-3, Decl. Bucaro, Ex. B). The trademark licenses are granted by BP on a location-by-location basis with the address of each site approved for sales under the BP trademark listed as an "Approved Site" on the BJC's Attachment A. (ECF No. 2-2 at 7 (citing Decl. Bucaro ¶ 25)). All of the gasoline and diesel sold under the BJC is "branded," meaning

that it can be sold only at a retail outlet for which BP issued a trademark license. (ECF No. 2-2 at 7 (citing BJC at 2(a)(i) and 2(d)-(e))).

Currently, PMG has 133 Approved Sites under the BJC, five of which are at issue in this motion for a preliminary injunction. (Opp. at 11).

**B. <u>The Sublease</u>** <u>(TA and PMG)</u>

In 2023, BP acquired TA. Before the acquisition, TA sold motor fuels directly to consumers as a motor fuels retailer at the Travel Centers. (ECF No. 2-2 at 5). After the acquisition, Maryland and Connecticut retail divorcement laws required that an independent retailer—not a refiner, like BP, or its subsidiary—sell retail motor fuel at TA travel centers in those states. *See* Md. Code Ann., Bus. Reg. § 10-311; Conn. Gen. Stat. § 14-344c.

To comply with these requirements, BP identified candidates to operate the Maryland and Connecticut TA travel centers from among its branded distributors and retailers and ultimately selected PMG. (ECF no. 2-2 (citing Decl. Bucaro ¶¶ 7-12, 15)). PMG dealt only with BP representatives in the discussions leading up to BP's selection of PMG as the new retailer. (ECF No. 2-2 at 6 (citing Decl. Bucaro ¶¶ 8-10, 12-13, 16, 18)). PMG had no discussions with representatives of TA until after the decision had been made to permit PMG to operate a BP-branded motor fuels business at the TA sites. (ECF No. 2-2 at 6 (citing Decl. Bucaro ¶¶ 16-17)).

On June 15, 2023, TA and PMG negotiated and entered into the Sublease (formally titled the "Master Equipment Lease and Services Agreement"), with TA, as Lessor, and PMG, as Lessee. (ECF No. 2-3, Decl. Bucaro, Ex. C Sublease). BP is not a party to the Sublease.

To acquire the right to sell BP-branded fuel products at the Travel Centers, the Sublease required that PMG convert 32 of the retail outlets that it supplies in the Baltimore market to BP or Amoco brands by a certain date.[3] (ECF No. 2-2 at 10; ECF No. 2-3, Decl. Bucaro, Ex. C Sublease § 4.1; Opp. at 9).

Under the Sublease, PMG paid TA to manage the day-to-day sales to the public, while PMG remained responsible for coordinating the supply of fuel products for sale at the travel centers. (ECF No. 2-3, Decl. Bucaro, Ex. C, Sublease § 2.4 & Sublease Ex. C). The Sublease granted PMG rights for ingress and egress to reach and operate the gas storage and equipment at the travel centers. (*Id.* at Sublease § 2.1).

The Sublease expressly provided that it did not grant trademarks or other licenses to PMG: "This Agreement does not grant or license to Lessee any right to use trademarks, service marks or color schemes owned by, or licensed to, Lessor." (*Id.* at Sublease § 17.1).

Section 3.1 of the Sublease provides for a three-year term, which commenced on August 1, 2023, and was set to expire on August 31, 2026, unless terminated or extended. (*Id.* at Sublease § 3.1).

[3] As stated in Sublease § 4.1, this conversion requirement was governed by a "separate agreement" for each site pursuant to BP's Jobber Outlet Incentive Program ("JOIP"). (ECF No. 2-2 at 9-10; *see, e.g.*, ECF No. 2-3, Decl. Bucaro Ex. F (providing example of JOIP contract)). Under the JOIP, BP agreed to advance money to retailers, such as PMG, to fund conversions of sites to BP-branded retail locations. The funds from BP are subject to contingent repayment obligations. The recipient must commit to purchase motor fuels from BP (or a BP branded distributor) and sell the motor fuels at the converted site under BP's trademarks for a period of ten (10) years.

**C. Addendum to BJC Following BP's Acquisition of TA**

Following BP's acquisition of TA, on September 1, 2023, BP and PMG entered into an Addendum to the BJC (the "Addendum"), under which Attachment A to the BJC was replaced to include the five Travel Centers as "Approved Retail Sites." (ECF No. 2-3, Decl. Bucaro ¶ 27 & Ex. D). The Addendum thereby extended the trademark licenses to PMG to sell BP-branded products at the Travel Centers and required sales of 300,000 gallons annually for each site (ECF No. 2-2 at 7 (citing Decl. Bucaro ¶ 27 & Ex. D)).

**D. Nonrenewal Upon Expiration of Sublease's Three-Year Term**

The three-year term on the Sublease between TA and PMG expires on August 31, 2026. (ECF No. 2-2 at 10; ECF No. 2-3, Decl. Bucaro, Ex. C Sublease § 3.1). According to PMG Vice President, Jeff Bucaro, throughout the term of the Sublease, PMG has performed its obligations and neither BP nor TA has ever served PMG with a notice of default, breach, or failure to comply under the BJC, the Addendum, or the Sublease. (ECF No. 2-3, Decl. Bucaro ¶ 65).

On April 15, 2026, Anne Clancy, Senior Manager at TA, wrote to PMG notifying PMG that the Sublease would expire on August 31, 2026 (the "Letter"). (ECF No. 2-3, Decl. Bucaro Ex. G). The Letter states, in relevant part:

> On behalf of TA, this letter is provided to PMG to confirm and acknowledge in writing that in accordance with Section 3.1 of the Lease, and the Lease Commencement Date Agreement between PMG and TA dated September 12, 2023, the Lease will expire in accordance with its terms on August 31, 2026.
>
> All terms and conditions of the Lease remain in full force and effect until such expiration. Capitalized terms used but not otherwise defined in this letter shall have the meanings given to such terms in the Lease.

*Id.* The Letter does not address whether there are options for renewal and does not identify any grounds for nonrenewal.

Around the time of the Letter, PMG contacted BP to discuss whether BP would consider renewing the Sublease. (ECF No. 2-2 at 11; ECF No. 2-3, Decl. Bucaro ¶¶ 66-70). In these conversations, PMG learned that BP would continue to sell BP-branded fuels at the Travel Centers, but would do so through another independent third party. PMG would not be offered the opportunity to make any of those sales. (ECF No. 2-2 at 11 (citing Decl. Bucaro ¶¶ 66-70)).

**E. This Action**

On August 6, 2026, PMG filed this action against BP and TA. PMG's Complaint alleges two counts against the Defendants: Count I for unlawful non-renewal under the Act and Count II for failure to provide notice under the Act.[4] (Compl. at 6, 10). As relief, PMG seeks a preliminary injunction, primarily to extend the Sublease during the pendency of the action. PMG also seeks a permanent injunction to enjoin Defendants from nonrenewing the Sublease, or, alternatively, an injunction to extend the Sublease until Defendants offer Plaintiff a new renewal sublease in accordance with the Act. (Compl. at 12-13). In addition, PMG seeks damages for any lost profits and attorneys' fees. (Compl. at 13).

On August 6, 2026, PMG filed the motion for a preliminary injunction (ECF No. 2) (the "Motion"). The Motion specifically requested a hearing before August 31, 2026 (the

[4] As noted *supra*, "Count III" is not a separate count or claim, but simply an argument in support of TA's joinder as a party in the action. (Compl. at 11).

Sublease expiration date). (ECF No. 2 at 3). Defendants filed an Opposition to the Motion (ECF No. 24) (the "Opposition" or "Opp.") to which Plaintiff replied (ECF No. 26) (the "Reply"). The Court heard oral argument from the Parties at a hearing on August 26, 2026.

## THE PETROLEUM MARKETING PRACTICES ACT

The Petroleum Marketing Practices Act (the "Act"), 15 U.S.C. § 2801 *et seq.*, protects franchisees by defining the standards under which a petroleum franchisor may terminate or non-renew a motor fuel franchise. *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. LLC*, 559 U.S. 175, 177 (2010) (citing 15 U.S.C. § 2802). To invoke the Act's protections, franchisees must first prove that their franchise was terminated or nonrenewed. *Korangy v. Mobil Oil Corp.*, 84 F. Supp. 2d 660, 664 (D. Md. 2000) (citations omitted). Under the Act's operative provisions, a franchisor may terminate or non-renew a franchise relationship at the conclusion of its term only if (1) the franchisor provides written notice and (2) takes the action in question for a permissible reason under the Act. *Mac's*, 559 U.S. at 178 (citing 15 U.S.C. §§ 2802, 2804). The written notice must identify the basis for the termination or nonrenewal. 15 U.S.C. § 2804(c). The permissible grounds for termination or nonrenewal are contained in 15 U.S.C. § 2802(b) and include grounds such as the failure of a franchisee to comply with a reasonable and material provision of the franchise or a failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise. *Id.* § 2802(b)(2)(A).

A franchisee may sue a franchisor that does not comply with the Act's restrictions on terminations and non-renewals. If successful, the franchisee can receive compensatory and punitive damages, reasonable attorney's fees and expert costs, and equitable relief. *Mac's*, 559

U.S. at 179 (citing 15 U.S.C. § 2805). Notably, the Act also provides a relaxed standard to govern requests for preliminary injunctive relief. *Id.* (quoting 15 U.S.C. § 2805(b)(2)).

**STANDARD OF REVIEW**

"The franchisee's burden of proof for receiving a preliminary injunction under the [Act] is not a heavy one." *Fursyth Petroleum Found. Inc. v. PMIG 1025, LLC*, 2022 WL 1663564, at *4 (D. Md. May 25, 2022) (quoting *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1216 (7th Cir. 1984)).

Under 15 U.S.C. § 2805(b)(2), a court must grant a preliminary injunction if the franchisee establishes that (1) "the franchise of which [it] is a party has been terminated or the franchise relationship of which [it] is a party has not been renewed," (2) there exist "sufficiently serious questions going to the merits to make such questions a fair ground for litigation," and (3) "the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted." *Id.*; *Barnes v. Gulf Oil Corp.*, 824 F.2d 300, 304-07 (4th Cir. 1987); *Duncan Servs., Inc. v. Exxonmobil Oil Corp.*, 668 F. Supp. 2d 719, 728 (D. Md. 2009).

The showing required for an injunction under the Act is less demanding than that required to prevail in a preliminary injunction pursuant to Fed. R. Civ. P. 65. No showing of irreparable harm is required, nor is the franchisee required to show a probability of success on the merits. *Fursyth*, 2022 WL 1663564, at *5.

**ANALYSIS**

The Parties principally dispute the threshold question of whether there has been a nonrenewal of the franchise relationship between BP and PMG.

Plaintiff argues that the Travel Centers satisfy the three components of a franchise under the Act: (i) a contract to use the refiner's trademark; (ii) a contract for the supply of motor fuel; and (iii) a lease for the marketing premises. (ECF No. 2-2 at 12 (citing, *inter alia*, *Mac's Shell*, 559 U.S. at 186-88)). The Sublease, therefore, constitutes an essential component of the franchise, and the failure to continue or extend it is sufficient to qualify as a nonrenewal of the franchise relationship. *Id.* at 12-13 (citing, *inter alia*, *Metroil, Inc. v. ExxonMobil Oil Corp.,* 672 F.3d 1108, 1111 (D.C. Cir. 2012)). Since the trademark licenses and fuel sales are location-specific, the other two essential components fall with the nonrenewal of the Sublease. *Id.* Assuming the Act applies to the Sublease, Plaintiff contends that it has raised sufficiently serious questions going to the merits because BP failed to identify a proper basis for the nonrenewal and TA's Letter of April 15, 2026 does not satisfy the Act's notice requirements. (ECF No. 2-2 at 22). Plaintiff also contends that the hardship it would face in the absence of an injunction would be greater because PMG would lose the ability to operate the Travel Centers and the investments it has undertaken to be eligible to do so. (ECF No. 2-2 at 22-25).

Defendants contend that PMG cannot establish nonrenewal because (1) the Sublease is not essential to the fuel franchise agreement and therefore is not part of it (Opp. at 13-14); (2) TA is not a franchisor and cannot be sued under the Act because it does not authorize trademark rights (*id.* at 15-16, 18); and (3) TA's affiliation with BP is insufficient to bring it within the ambit of the Act. (*id.* at 18-20 (citing *Jet, Inc. v. Shell Oil Co.*, No. 02 C 2289, 2002

WL 31641627 (N.D. Ill. Nov. 22, 2002)). In support of these arguments, Defendants emphasize that the franchise relationship between BP and PMG predated the Sublease and will continue, albeit at locations other than the Travel Centers, after the Sublease expires. (Opp. at 24). Similarly, Defendants contend that there are no sufficiently serious questions on the merits since the franchise relationship will continue after the Sublease's expiration. (Opp. at 25). Regarding harm, Defendants contend that the harm that BP and TA will suffer from the forced continuation of a commercial lease is greater than the monetary harm on PMG if the Sublease was allowed to expire. (Opp. at 25-27).

For the reasons set forth below, the Court finds that the nonrenewal of the Sublease constitutes nonrenewal of the franchise relationship between BP and PMG under the Act. The Court also finds that PMG has identified sufficiently serious questions regarding the validity of the nonrenewal and that the balance of harms favors an injunction to continue the Sublease. The Court grants a preliminary injunction to continue the Sublease, among other obligations related to PMG's sale of BP-branded fuel.

## I. Nonrenewal of the Franchise Relationship

As a precondition for preliminary injunctive relief under the Act, PMG, as the franchisee, must show either that "the franchise of which he is a party has been terminated or **the franchise relationship of which he is a party has not been renewed**." 15 U.S.C. § 2805(b)(2)(A)(i) (emphasis added). As nonrenewal is at issue, PMG must establish the latter.

A. <u>The Sublease is an essential element of the franchise relationship.</u>

Under the Act, a "franchise" means "any contract" between parties, such as a refiner and distributor or retailer, under which a refiner authorizes the use of its trademark in the sale of fuel; any contract under which a retailer or distributor is permitted to occupy leased marketing premises for the sale of the branded motor fuel; and any contract for the supply of motor fuel to be sold. *See* 15 USC § 2801(1); *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. LLC*, 559 U.S. 175, 179 n.1 (2010); *Metroil, Inc. v. ExxonMobil Oil Corp.*, 672 F.3d 1108, 1115-16 (D.C. Cir. 2012) (Kavanaugh J.) (similar); *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 860 (7th Cir. 2002).

The Act's definition of "franchise relationship" incorporates "franchise" but is defined "in more general terms." *Mac's Shell Serv., Inc.*, 559 U.S. at 179. "Franchise relationship" means "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a *franchise*." 15 U.S.C. § 2801(2)(emphasis added).[5] In other words, "[t]o allege a failure to renew a franchise

---

[5] The Act intentionally used the more general "franchise relationship" for nonrenewal to reflect the understanding that the parties' obligations may remain even though contracts creating the franchise may be subject to revision by the parties. In other words,

> The Act created a new term, the franchise relationship, as distinguished from the franchise itself. This term covers the broad relationship which exists between a franchisor and a franchisee by reason of the franchise agreement. It is used because the franchise, i.e. the contract, may no longer exist and it assures that the parties understand that even though the contract no longer is in effect, there may still be a viable relationship between the parties.

*Baldauf v. Amoco Oil Co.*, 553 F. Supp. 408, 410 (W.D. Mich. 1981), *aff'd*, 700 F.2d 326 (6th Cir.1983).

relationship, a franchisee must allege that it is unable to use the franchisor's trademark, to obtain the franchisor's motor fuel, or to use the franchisor's service station." *Metroil, Inc.*, 672 F.3d at 1116 (citing *Dersch Energies, Inc.*, 314 F.3d at 860).

PMG has established a nonrenewal of the "franchise relationship" through nonrenewal of the Sublease. PMG will be unable to use BP's location-specific trademark licenses or continue its operation of the Travel Centers, which BP authorized, if the Sublease is nonrenewed. *Cf. Metroil, Inc.*, 672 F.3d at 1116 (finding because retailer still used Exxon's trademark, obtained motor fuel, and "use[d] the service station in question" it could not show nonrenewal from the assignment).

The Sublease is an essential element of a "franchise" under which PMG and BP's obligations arise. *See* 15 U.S.C. § 2801(1). The Act provides that a franchise includes leases that permit a franchisee to sell trademarked goods:

> **any contract under which a retailer or distributor** . . . is **authorized or permitted to occupy leased marketing premises which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark** which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy.

15 U.S.C. § 2801(1)(B) (emphasis added); *see also Daniels v Dilmar Oil Co.*, 502 F Supp 178, 179-80 (D.S.C. 1980) (granting preliminary injunction prohibiting termination of lease agreement which constituted a "franchise" under the Act where retailer leased premises to sell Texaco-branded oil).

Here, it is undisputed that BP authorized PMG to occupy the Travel Centers for the marketing and distribution of BP-branded fuel. PMG has identified the Addendum entered

between BP and PMG which identifies the Travel Centers and thereby extends location-specific BP trademark licenses to PMG. (ECF no. 2-2 at 7 (citing Decl. Bucaro ¶ 27 & Ex. D)). PMG has also provided evidence that BP selected PMG to occupy the Travel Centers, and that all of the negotiations for PMG's occupancy were with BP representatives, not TA. (ECF No. 2-2 at 6 (citing Decl. Bucaro ¶¶ 7-10, 12-18)). Therefore, the Court finds that PMG has established nonrenewal of the franchise relationship by virtue of the nonrenewal of the Sublease.

B. <u>The Sublease falls within the ambit of the Act even though BP's wholly-owned Subsidiary, TA, is the sublessor</u>.

Defendants assert that the Sublease does not constitute an essential element of the franchise relationship between BP and PMG because the Sublease is entered between PMG and TA only—BP is not a party. (Opp. at 15-16). The Court finds instead that the Act is designed to encompass BP's indirect control of the Sublease through its wholly-owned subsidiary, TA. The Act's definition of a franchise extends to agreements between a refiner franchisor's affiliate and the franchisee which are essential to the franchise.

The term "franchise" means "any contract," including those between a "refiner and a distributor" or "retailer" under which a "refiner" authorizes use of a trademark controlled by the refiner in connection with the sale or distribution of motor fuel. 15 U.S.C. § 2801(1)(A). The Act envisions that parties to such a contract, include a broadly defined "refiner": "any person engaged in the refining of crude oil to produce motor fuel, and **includes any affiliate of such person**." 15 U.S.C. § 2801(5) (emphasis added). Here, the Parties recognize that TA is an affiliate of BP, the refiner franchisor. (*See, e.g.*, Opp. at 4). Therefore, although TA is not

the direct franchisor, its Sublease with PMG may still constitute an essential component of the "franchise" for each of the Travel Centers.

The Act's definition of "leased marketing premises" confirms that the Sublease between TA and BP is an essential component of the franchise. As discussed *supra*, the Act's definition of a franchise includes "any contract" under which a retailer/distributor "is authorized or permitted to occupy leased marketing premises." 15 U.S.C. § 2801(1)(B)(i). "Leased marketing premises" are further defined as "marketing premises owned, leased, **or in any way controlled by a franchisor** and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel." 15 U.S.C. § 2801(9). Thus, the Sublease squarely fits within the Act's definition of this essential component of a franchise. First, the Sublease is a contract under which PMG, as the retailer/distributor, is authorized to occupy the Travel Centers in connection with sale of BP-branded motor fuel (*see* Sublease § 2.3(b); ECF no. 2-2 at 7 (citing Decl. Bucaro ¶ 27 & Ex. D (attaching Addendum to BJC between PMG and BP listing the five Travel Centers as "Approved Sites"))). Second, BP has in a way "controlled" the Travel Centers by vetting and selecting the franchisees to occupy the premises and directing the nonrenewal and intended replacement here. (ECF No. 2-2 at 6; ECF No. 2-3, Decl. Bucaro ¶¶ 7-10, 12-18, 66-70)).

Reading the Act's provisions to extend to the Sublease between a franchisor's wholly-owned subsidiary and the franchisee comports with the purpose and intent of the Act. As remedial legislation, the Act must be construed liberally, consistent with its goal of protecting franchisees. *Barnes v. Golf Oil Corp.*, 824 F.2d 300, 305 (4th Cir. 1987) (quoting *Khorenian v.*

*Union Oil Co. of Calif.*, 761 F.2d 533, 535 (9th Cir. 1985)). As Plaintiff correctly observes, the Senate Report from the 95th Congressional Session confirms that the Act was designed to prevent franchisors from circumventing the statutory protections for franchisees:

> The term "franchise" is defined in terms of a motor fuel trademark license. It should be noted that the term is applicable only to the use of a trademark which is owned or controlled by a refiner. Secondary arrangements, such as leases of real property or motor fuel supply agreements are incorporated in the definition of a franchise. Therefore, the substantive provisions of the title, relating to the termination of a franchise or nonrenewal of the franchise relationship, may not be circumvented by termination or nonrenewal termination or nonrenewal of the real estate lease or motor fuel supply agreement which thereby renders the trademark license valueless.

Sen. Rep. No. 95-731, 95th Cong., 2d Sess., reprinted in (1978) U.S. Code, Cong. & Ad. News 873, 888; (ECF No. 2-2 at 17-18). Courts have likewise recognized that a franchisor's actions may indirectly result in the termination of a franchise or the nonrenewal of a franchise relationship, triggering the Act's protections. *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 859 (7th Cir.2002) (finding that the PMPA covers termination of any of the three statutory components of the franchise agreement, including a lease of the premises). In *Dersch*, the Seventh Circuit Court of Appeals explained:

> Most of the time, it is obvious when a termination or nonrenewal has taken place. **There are, however, situations where a franchisor's actions will indirectly result in the termination of a franchise or the nonrenewal of a franchise relationship—i.e., an informal termination or nonrenewal**. We recognized this possibility in *Beachler*, 112 F.3d at 906, when we held that the assignment of a franchise will result in a termination or nonrenewal, within the meaning of the PMPA, if a franchisee demonstrates that the assignment terminated or discontinued any of the "'three statutory components of the franchise agreement,' which include 'the contract to use the refiner's trademark, the contract for the supply of motor fuel, [and] the lease of the premises,'" *id.* (citation omitted) (emphasis added).

*Id.* at 859 (citing *Beachler v. Amoco Oil Co.,* 112 F.3d 902, 906 (7th Cir.1997)).

Here, Plaintiff has sufficiently established that nonrenewal occurred through BP's exercise of control over the Sublease. 15 U.S.C. § 2805(b)(2)(A)(i); 15 U.S.C. § 2801(1)(B). To summarize, the following facts show BP's control of the Sublease:

- BP's wholly-owned subsidiary, TravelCenters of America, is the sole member of TA, the sublessor to the Sublease. (Opp. at 4).

- PMG has provided evidence that BP selected PMG for the five Travel Center locations, and that all of the negotiations were with BP representatives, not TA. ECF No. 2-2 at 6 (citing Decl. Bucaro ¶¶ 7-10, 12-18)).

- To acquire the right to sell BP-branded fuel products at the Travel Centers, PMG was required, under the Sublease, to convert 32 of the retail outlets that it supplies in the Baltimore market specifically to the BP or Amoco brands on or before December 31, 2023. (ECF No. 2-2 at 10; ECF No. 2-3, Decl. Bucaro, Ex. C Sublease § 4.1; Opp. at 9 (citing ECF No. 24-2 at 10, Decl. Clancy Ex. A, Sublease § 4.1)).

- PMG had no discussions with representatives of TA until after the decision had been made to permit PMG to operate a BP-branded motor fuels business at the TA sites. (ECF No. 2-2 at 6 (citing Decl. Bucaro ¶¶ 16-17)).

- BP, through the Addendum with PMG, identified the five subleased Travel Centers' locations where it would extend PMG trademark licenses to sell BP-branded products. (ECF no. 2-2 at 7 (citing Decl. Bucaro ¶ 27 & Ex. D)).

- Even the April 15, 2026, Letter notifying PMG of the expiration of the Sublease came from a TA Senior Manager with an "@bp.com" email domain. (ECF No. 2-2, Decl. Bucaro Ex. G).

- PMG discussed with BP whether BP would consider renewing the Sublease. (ECF No. 2-2 at 11). In these conversations, PMG learned that BP would continue to sell BP-branded fuels at the Travel Centers, but would do so through another independent third party. PMG would not be offered the opportunity to make any of those sales. (ECF No. 2-2 at 11 (citing Decl. Bucaro ¶¶ 66-70)).

Therefore, the Court finds PMG established that TA's nonrenewal of the Sublease constitutes a nonrenewal of the franchise relationship under the Act. 15 U.S.C. § 2805(b)(2)(A).

Defendants' cited authorities do not counsel otherwise. Defendants claim that since TA is not a franchisor under the PMPA (a fact the Parties do not dispute), the Act's enforcement provisions do not extend to TA and the Sublease. (Opp. at 18-21). Defendants cite *Jet, Inc. v. Shell Oil Co.*, No. 02 C 2289, 2002 WL 31641627 (N.D. Ill. Nov. 22, 2002) for the proposition that corporate affiliates of a franchisor do not fall within the Act if their relationship with the franchisee does not include trademark authorization. (Opp. at 19-20). In *Jet*, plaintiff franchisees brought claims for violations of the Act against three related entities: Shell Oil, Equilon Enterprises, and Equiva. Equilon and Equiva were owned in large parts by Shell during the relevant time. Shell assigned Equilon the franchise agreements. *Id.* at *1. At the time of renewal, Equilon presented agreements that Plaintiffs argued differed substantially from previous ones. *Id.* at *1-2. Ruling on a motion to dismiss, the Court recognized that the Act confers on franchisees a cause of action against a *franchisor*, and that Shell and Equiva no longer fit that definition. *Id.* at *6.

First, *Jet* is inapposite because PMG does not contend that TA is a franchisor. (ECF No. 26 at 9-11). Moreover, *Jet* does not involve a case where a franchisor, such as BP, outsourced one of the essential components of the franchise relationship (a lease for premises to sell the branded fuel products) to its wholly-owned subsidiary. Instead, *Jet* involved a *single* current franchisor. *Jet*, 2002 WL 31641627, at *1-2.

Defendants' other cited authorities do not support that the Sublease is separate from the franchise relationship between BP and PMG. (Opp. at 12-15, 18-19). For example, Defendants cite *Smith v. Atlantic Richfield Co.*, 533 F. Supp. 264, 268 (E.D. Pa. 1982) for the proposition that "[o]nly those secondary arrangements that are 'essential to the operation of a motor fuel franchise' fall within the statute's protection." (Opp. at 14). However, in *Smith*, the Court held that termination of an agreement to operate an adjacent convenience store did not constitute termination of the franchise agreement since the retailer could still buy and sell the trademarked fuel and continue its lease of the gas station on the property to do so. *Id.* at 268-69. Therefore, the Court found no termination of the PMPA franchise based on the termination of the convenience store agreement. *Id.* Unlike the convenience store agreement, the Sublease at issue here is "essential to the operation of a motor fuel franchise," and its nonrenewal would prevent PMG from selling BP's trademarked fuel at the five travel centers.

Defendants also cite *Hutchens v. Eli Roberts Oil Co.*, 838 F.2d 1138 (11th Cir. 1988) for the proposition that "[t]he PMPA requires a direct contractual franchise relationship between the defendant and the plaintiff before PMPA liability may attach." (Opp. at 18-19). However, PMG has already clarified that its claims under the Act are brought only against BP, its direct franchisor, and not against TA, the sublessor. (ECF No. 26 at 9-10). Defendants' reliance on *Hutchens* is misplaced because it does not speak to the issue discussed above: whether nonrenewal of a contract with a franchisor's affiliate can comprise part of the franchise relationship.

In *Hutchens*, plaintiff retailer Hutchens brought claims under the Act against its direct franchisor (Robert Oil), which subleased the gas station to the retailer and also supplied the

retailer with Fina-branded fuel. *Id.* at 1140. Plaintiff retailer also brought claims under the Act against Fina when Robert Oil agreed to cancel its underlying lease from Fina. *Id.* Because Roberts Oil was to cancel the underlying lease, Hutchens' sublease could not be renewed. *Id.* The retailer Hutchens had no contractual relationship with Fina, the refiner, but argued that Fina actually controlled who would occupy the premises and therefore was Hutchens' franchisor. *Id.* at 1143-44. The Eleventh Circuit Court of Appeals rejected plaintiff retailer's argument, noting there was no case law to support Hutchens' claim that refiner Fina's control over the premises made it a franchisor under the Act. *Id.* at 1144. The Court clarified that under the "PMPA a franchise is viewed as a direct contractual relationship." *Id.* at 1144-45 ("It is simply not enough to establish a franchise relationship between a refiner and a retailer that a lease between the refiner and its distributor contains boilerplate language that requires the distributor to obtain the refiner's consent before subleasing the premises.").

*Hutchens* is readily distinguishable from the relationships at issue here. Unlike the *Hutchens* scenario, PMG has a direct contractual relationship with the refiner BP, who controls and selects the sublessee for TA; and PMG also has a direct contractual relationship with TA under its Sublease. Therefore, PMG has a direct contractual, franchisor relationship with BP, the entity that controls its trademarks and the renewal of PMG's sublease. *Hutchens* is also distinguishable because the direct franchisor voluntarily relinquished its lease and therefore could not renew the franchisee's sublease—it was not a situation in which the franchisor was maintaining control over the premises in "an attempt to capitalize on the departed franchisee's goodwill." *Id.* at 1142. The case here implicates this very concern, which is at the heart of the

Act, because TA (and BP, more indirectly) still have the underlying lease—the Defendants here have just decided to nonrenew and replace PMG with a new sublessee.

Finding that PMG has established nonrenewal of the franchise relationship, the Court turns to the remaining requirements for preliminary injunctive relief under the Act. 15 U.S.C. § 2805(b)(2).

**II. Sufficiently Serious Questions Going to the Merits**

The franchisee must show the existence of sufficiently serious questions as to the propriety of the termination or nonrenewal under the Act to present a fair ground for litigation. *See Khorenian v. Union Oil Co.*, 761 F.2d 533, 536 (9th Cir. 1985). Plaintiff's burden is to show only that there is a "reasonable chance" that Defendants will be unable to prove their affirmative defense that the nonrenewal was permissible under the Act. *Khorenian*, 761 F.2d at 535-36.

PMG has identified sufficiently serious questions concerning BP's nonrenewal. The Parties do not dispute that the Letter dated April 15, 2026 was the written notice provided to PMG of the Sublease's expiration on August 31, 2026. This Letter failed to provide any basis for the nonrenewal, as required by the Act, to assess whether the nonrenewal is permissible. 15 U.S.C. § 2804(c); (ECF No. 2-2 at 10-11, 22; ECF No. 2-3 Decl. Bucaro ¶¶ 70-72). Defendants have not contended that the Letter complies with the PMPA or that there exists a permissible basis under the PMPA for the Sublease's nonrenewal. (*See* Opp. at 25 (not addressing, in its discussion of the sufficiently serious questions requirement, whether the Letter would provide sufficient notice under the PMPA or whether a permissible basis for the nonrenewal existed under the PMPA)).

Further, PMG has put forward evidence that it received no other notice of breach or deficiency from BP or TA, that could provide a permissible basis for the nonrenewal. According to PMG Vice President, Jeff Bucaro, throughout the term of the Sublease, PMG has performed its obligations and neither BP nor TA has ever served PMG with a notice of default, breach, or failure to comply under the BJC, the Addendum, or the Sublease. (ECF No. 2-3, Decl. Bucaro ¶ 65).

PMG has identified sufficiently serious questions regarding whether the notice of the Sublease's expiration comports with the Act.

### III. Balance of Hardships

"In the absence of unusual circumstances the balance of hardships imposed upon the franchisor by the issuance of a preliminary injunction will normally be less than the hardship imposed upon a franchisee if injunctive relief is not granted." *Fursyth Petroleum Found. Inc. v. PMIG 1025, LLC*, 2022 WL 1663564, at *8 (D. Md. May 25, 2022) (quoting *Pearman v. Texaco, Inc.*, 480 F. Supp. 767, 770 (W.D. Mo. 1979)).

PMG has identified hardships that it will experience if the injunction does not issue: namely, it will be replaced with another franchisee at the five Travel Centers that it has operated in recent years. (ECF No. 2-2 at 11 (citing Decl. Bucaro ¶¶ 66-70); *id.* at 24-25). The replacement will deprive PMG of amounts that the Travel Centers generate, but it will also remove the primary consideration that PMG received under the Sublease for undertaking conversion responsibilities for 32 other locations. (ECF No. 2-2 at 24-25). PMG claims that it will be unable to recoup what it gave to BP for the conversions in exchange for the right to operate the Travel Centers. (ECF No. 2-2 at 24 (citing, inter alia, Decl. Bucaro ¶¶ 45, 79); *see*

*also id.* at 10 (also identifying repayment obligation costs to PMG if it elects to debrand the newly converted locations)).

On the other hand, BP and TA have only cited their lack of control over managing their businesses if the injunction is issued, forcing them to extend a commercial lease. (Opp. at 26; ECF No. 24-2, Decl. Clancy ¶ 13). Defendants have identified no significant costs or opportunities that it would lose if an injunction issued. *Id.* Therefore, the hardships imposed on PMG if the injunction is not issued would be greater than the harm imposed on Defendants from the issuance of the injunction.

Under the Act, PMG is entitled to preliminary injunctive relief to continue the Sublease.

**IV. Scope of the Preliminary Injunction**

On August 26, 2026, after considering the Parties' positions during oral argument, the Court issued an Order granting PMG preliminary injunctive relief to continue the relevant parts of the Sublease between TA and PMG and the related franchise relationship between PMG and BP. (ECF No. 27). The Court's Order narrowed Plaintiff's requested relief so that the preliminary injunction only applies to branded motor fuel at the five Travel Centers and related agreements protected under the Act. *See id.* at 2 (ordering that BP shall not "remove or replace Plaintiff as the operator of the BP branded retail motor fuels businesses at the . . . TA Travel Centers" or "revoke, invalidate, or otherwise cancel the trademark licenses [for the Travel Centers]"). As Defendants correctly observe, the revisions were necessary because the Act only applies to franchises for branded motor fuels, and therefore would not apply to the Parties' obligations for unbranded fuel. (*See* Opp. at 27-28 (collecting cases recognizing that the Act does not extend to unbranded fuel operations)); *DG Gas, LLC v. TA Franchise Sys.*

*LLC*, No. 1:24-CV-01002-PAB, 2025 WL 814928, at *16 n.28 (N.D. Ohio Mar. 14, 2025) ("It is well-established that the PMPA does not apply to unbranded fuel." (citing *Catch 26, LLC v. LGP Realty Holdings, LP*, 2017 WL 4864856, at *1 (N.D. Ill. Oct. 27, 2017)).

Having determined that the Sublease was an essential part of the franchise relationship between PMG and BP, the Court also enjoined Defendant TA "to continue and extend the term of the Sublease as to BP branded motor fuel until a final decision on the merits is rendered." (ECF No. 27 at 2). Although PMG does not bring a claim against TA under the Act, TA is bound by the preliminary injunction because TA has been joined as a party in this action, has received notice of the injunction, and because TA is an entity "in active concert or participation" with Defendant BP regarding the Sublease. *See* Fed. R. Civ. P. 65(d)(2) (providing that persons "bound" by an injunction are the parties, the parties' officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with [either of the preceding categories]"); *Little v. Associated Technical Training Servs. Inc.*, 12 F.3d 205 (Table),1993 WL 498282, at *3-4 (4th Cir. Dec. 3, 1993) (recognizing that Rule 65(d) rule as to who is bound by an injunction is "is derived from the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control" (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)). Therefore, the Order here properly binds Defendant TA because it is an affiliate of BP and subject to its control with respect to the Sublease.

The court declined to exercise its discretion to order Plaintiff to post a bond prior to the issuance of the preliminary injunction. *See* 15 U.S.C. § 2805(b)(3). Here, Defendants have

not made an adequate showing of harm from the injunction to justify such a bond. (Opp. at 29 (citing ECF No. 24-2, Decl. Clancy ¶ 13)); *Hoechst Diafoil Co. v. Nan Ya Plastics, Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999) (citations omitted); *Fursyth*, 2022 WL 1663564, at *9 (declining to exercise discretion to require Plaintiff to post bond upon issuance of injunctive relief under the Act). The Court therefore ordered the preliminary injunction without a requirement that Plaintiff post a bond. The Order is made without prejudice to Defendants seeking reconsideration as to whether or not a bond should be posted, should circumstances change prior to trial.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for a Preliminary Injunction (ECF No. 2) is GRANTED under the terms identified in the Court's Order dated August 26, 2026. (ECF No. 27). The Order is made without prejudice to Defendants seeking reconsideration as to whether or not a bond should be posted, should circumstances change prior to trial.

Date: August 28, 2026

/s/
Richard D. Bennett
United States Senior District Judge